**WILBURN et al., Appellees,**

**v.**

**CLEVELAND ELECTRIC ILLUMINATING COMPANY, Appellant.**

[Cite as *Wilburn v. Cleveland Elec. Illum. Co.* (1991), 74 Ohio App.3d 401.]

Court of Appeals of Ohio,
Cuyahoga County.

No. 58315.

Decided June 3, 1991.

**402**

*Dale F. Pelsozy*, for appellees.

*Squire, Sanders & Dempsey, Robin G. Weaver* and *Elizabeth A. Rader*, for appellant.

DYKE, Judge.

On June 18, 1984, at approximately 2:00 p.m., the National Weather Service issued a severe thunderstorm warning for the Greater Cleveland area. Defendant–appellant, Cleveland Electric Illuminating Company received the warning from the Weather Service and decided to hold over several crews in case of storm damage to its operations. The warning was cancelled at 3:30 p.m., but at approximately 4:00 p.m. a violent thunderstorm descended upon the Cleveland area. A large number of power wires were ripped down all over the area and service was disrupted to thousands of customers. At approximately 4:23 p.m., a power line came down and rested on the ground at West 28th and Church Avenue in Cleveland.[1]

At approximately 4:35 p.m., Officer Richard Kile of the Cleveland Metropolitan Housing Association ("CMHA") security force was travelling to CMHA's Lakeview Estates. On his way to the estates he passed the intersection of West 28th and Church and noticed the downed power line at the intersection. The wire, according to Officer Kile, was burning. Officer Kile immediately called his base station and asked the dispatcher to call appellant and notify it of the situation. Officer Kile waited approximately twenty minutes, in his vehicle, for appellant to arrive. While he was waiting, Officer Kile verified with CMHA's dispatcher that appellant was notified. At approximately 5:00 p.m., Officer Kile felt he had to attend to his CMHA duties and left the area. Appellant had not arrived when Officer Kile left. Officer Kile stated he never

1. Records from appellant's division substation show that appellant through repeated "tripping signals" was almost certainly made aware that the wire was down.

received instructions to stay on the scene, nor did he tell anyone he would remain.

Linda Anderson, employed by CMHA as a dispatcher on June 18, 1984, testified that she received notification from Officer Kile over the radio that a live wire was down. Anderson testified she notified appellant and received no instruction from appellant.

At approximately 6:25 p.m. that evening, Jamie Gary, a young child, was walking down the street with her mother and was struck by the downed power line at West 28th and Church. The child was knocked to the ground and injured. The Cleveland Police Department was notified and two Emergency Medical Service units ("EMS") were dispatched to the scene. When EMS arrived, they learned that the child had been already transported by a private individual to nearby Lutheran Hospital.[2]

One EMS unit remained on the scene in its van, sitting approximately fifteen to twenty feet from the downed wire. At approximately 6:34 p.m., Michael Wilburn, a nine-year-old boy, came upon the West 28th and Church intersection. As Michael walked by the line he grabbed it, causing four thousand two hundred volts of electricity to pass through his body. John Kulic, one of the EMS personnel on the scene, stated that he heard a scream and looked out the van's window and saw that someone had grabbed the wire. Kulic stated that the individual was clenching the wire and violently shaking back and forth. EMS personnel immediately exited their ambulance. EMS rescued Michael after the wire had burned free from his hands. In the ambulance Michael was unconscious, not breathing and had no pulse. CPR was started and his circulation revived. The ambulance left the scene at 6:41 and proceeded to Cleveland Metro General Hospital. George Nowicki, the other EMS individual on the scene, testified that he too witnessed Michael's electrocution and saw that Michael, as the electrocution occurred, was for a time in a vertical position.

Nicholas Lakatoz, an owner of a body shop located near the corner of West 28th and Church, also witnessed Michael's electrocution. Lakatoz testified that he saw Michael Wilburn walk by and grab the downed wire. Lakatoz yelled to Michael not to touch the wire but Michael already had the wire in his hands. Lakatoz stated that as Michael grabbed the wire he screamed, "Help me, help me." Lakatoz stated the wire "sucked him in," and that Michael went backwards on his heels, spun around three times and then hit the ground, still holding the wire on his chest.

---

2. The child sustained her injury and was later released that day from the hospital.

The record shows that appellant was notified at 6:36 p.m. by the fire department that a wire was down at West 28th and Church and again at 6:38 by a passerby. Shortly thereafter, Lutheran Hospital notified appellant that a child, Jamie Gary, had been injured by the downed wire. At 6:51 p.m., appellant dispatched a crew to the scene. When the crew arrived, they discovered that the downed wire had been cut clear, at the request of the police, by a Cleveland Public Power repair crew. The record shows that appellant's crew then stayed on the scene and rerouted the electricity. Appellants' crew left the scene for another call at 8:15 p.m.

When Michael arrived at the hospital he was in full cardiac arrest. In the emergency room his heart was restarted. He remained comatose. A physical exam revealed a young non-responsive male with severe electrocution burns to his hands and right foot. There were flexion contractures of both arms with burns in the left occipital parietal region, left buttock and upper thigh. The left calf also had an electrical burn. There were also burns to the anterior chest and over the right scapula. His head was normocephalic with evidence of electrical burn. There was a loss of multiple digits on the right hand. On June 19, 1984, Michael Wilburn did not show any neurological improvement. On June 20, 1984, the impression was cortical brain death and on the same day Michael Wilburn had a cardiac arrest and was pronounced dead. The coroner stated that the cause of death was bronchopneumonia and acute suppurative myocarditis due to electrical burns of the head, trunk and extremities.

Michael's mother, Hester Wilburn, individually and as administratrix of Michael's estate, brought wrongful death and survival actions against appellant. Several of Michael's siblings also filed suit by and through their mother, Hester Wilburn.[3] The jury returned a unanimous verdict in favor of appellees and awarded $500,000 to the estate of Michael Wilburn, $200,000 to Hester Wilburn and $50,000 each to three of Michael's siblings.

This is an appeal from the jury's verdict finding appellant liable for Michael's death and from the jury's award of $500,000 to Michael's estate.

I

"The trial court erred in denying CEI's motion for judgment notwithstanding the verdict because plaintiffs failed to sustain their burden of proving that CEI's response to the down wire under the circumstances was negligent."

---

**3.** The suits were filed pursuant to R.C. 2125.02, Ohio's wrongful death statute, and R.C. 2305.21, Ohio's survivorship statute.

## II

"Plaintiffs failed to establish that CEI's conduct was a proximate cause of plaintiffs' decedent's death and, therefore, the trial court erred in denying CEI's motion for judgment notwithstanding the verdict."

In the first two assignments of error, appellant argues it was error for the trial court to deny its motion for judgment notwithstanding the verdict. Appellant claims appellees did not present any affirmative evidence which demonstrated that appellant was negligent in the repair of downed wires on June 18, 1984, nor did they present evidence which showed that appellant's conduct proximately caused appellees' decedent's death.

■ Liability for negligence is predicated upon injury caused by the failure to discharge a duty owed to the injured party. *Brauning v. Cincinnati Gas & Elec. Co.* (1989), 54 Ohio App.3d 38, 40, 560 N.E.2d 811, 813, citing *Moncol v. Bd. of Edn.* (1978), 55 Ohio St.2d 72, 9 O.O.3d 75, 378 N.E.2d 155. To sustain an action founded upon negligence, a plaintiff must demonstrate (1) that the defendant had a duty, recognized by law, requiring him to conform his conduct to a certain standard for the protection of the plaintiff; (2) that the defendant failed to conform his conduct to that standard; and (3) that the defendant's conduct proximately caused plaintiff to sustain actual damage or loss. *Brauning, supra,* 54 Ohio App.3d at 40, 560 N.E.2d at 813–14.

A favorable ruling on a motion for judgment notwithstanding the verdict is not easily obtained. *Osler v. Lorain* (1986), 28 Ohio St.3d 345, 347, 28 OBR 410, 412, 504 N.E.2d 19, 21. Appellate review of a Civ.R. 50(B) [4] motion for judgment notwithstanding the verdict involves the same test to be applied in reviewing a motion for directed verdict: assuming the truth of the evidence presented by the nonmoving party, we must construe that evidence in the light most favorable to the nonmoving party and determine whether there is sufficient evidence relating to the essential issue to permit reasonable minds to reach different conclusions. Further, neither the weight of the evidence

---

**4.** Civ.R. 50(B) provides that whether or not a motion to direct a verdict has been made or overruled, and not later than fourteen days after entry of judgment, a party may move to have the verdict and any judgment thereon set aside and have judgment entered in accordance with the motion. A motion for new trial may be joined with the motion for judgment notwithstanding the verdict or a motion for new trial may be prayed for in the alternative.

Civ.R. 50(B) further provides that if the trial court reopens the judgment it shall either order a new trial or direct the entry of judgment but no judgment can be rendered by the court on the ground that the verdict is against the weight of the evidence.

Civ.R. 50(B) is not predicated upon a motion for directed verdict being made at trial, *i.e.,* the failure to move for a directed verdict at trial does not waive a party's ability to motion the court for judgment notwithstanding the verdict even though the standard of review is the same.

nor the credibility of the witnesses is for the court's determination in ruling upon either of the above motions. *Helmick v. Republic–Franklin Ins. Co.* (1988), 39 Ohio St.3d 71, 74, 529 N.E.2d 464, 467; *Osler v. Lorain, supra,* 28 Ohio St.3d at 347, 28 OBR at 412, 504 N.E.2d at 22; *Posin v. A.B.C. Motor Court Hotel* (1976), 45 Ohio St.2d 271, 275, 74 O.O.2d 427, 430, 344 N.E.2d 334, 338.

 A Civ.R. 50(B) motion is not predicated upon a motion for directed verdict being made at trial even though the standard of review is the same. We note, however, that at trial appellant specifically declined to move for a directed verdict because it felt sufficient evidence was presented which would cause reasonable minds to differ. At the close of appellees' case, appellant's counsel stated:

"Your Honor, we are not going to have the motion (for Directed Verdict). I believe this is a case that has a jury question in it and consequently we are not going to move for directed verdict."

Appellant's counsel reiterated this position at the close of its case by stating:

"Your Honor, this is clearly a case that presents a jury issue on both sides of the case. There is no question that the wire in question was CEI's. There is no question it came down and was reported to CEI at 4:35 and there is no question that the accident occurred at 6:33 before the Illuminating Company responded to it.

"The jury issue is very neatly framed and that is: Did CEI act or fail to act with reasonable care with respect to any duty it owed the Plaintiff by failing to respond to this wire within that two-hour period? That is the issue, an issue that both sides are going to have to argue to the jury."

Appellant now is in the curious position of arguing against the point it conceded at trial, *i.e.,* that reasonable minds could reach different conclusions in this case.

A company engaged in the transmission and distribution of electrical current has a duty "to exercise the highest degree of care consistent with the practical operation of its business in the construction, maintenance and inspection of its equipment." *Otte v. Dayton Power & Light Co.* (1988), 37 Ohio St.3d 33, 523 N.E.2d 835; *Hetrick v. Marion–Reserve Power Co.* (1943), 141 Ohio St. 347, 25 O.O. 467, 48 N.E.2d 103; *Brauning v. Cincinnati Gas & Elec. Co.* (1989), 54 Ohio App.3d 38, 40, 560 N.E.2d 811, 814. The issue in the present case is whether appellant conformed its conduct to that standard in the manner it repaired its wires which were downed by the storm and, if not,

whether appellant's failure to meet its duty proximately caused the decedent's injuries.

Appellees, in support of their contention that appellant did not conform its conduct to the standard and that its failure to do so proximately caused Michael's death, called Emerson Venable to testify. Venable, a consulting chemist and engineer specializing in engineering and safety problems which include electrical problems, testified that he was familiar with the National Electric Safety Code ("NESC") which controls the standards of a public utility in the installation, inspection and maintenance of its equipment, including transmission and distribution lines. Venable stated that according to the NESC, the responsibility for downed power lines is placed solely upon the utility company. Venable testified that based on (1) the chronology of the events in this case, (2) his investigation and research into the matter, (3) the relevant provisions of the NESC, (4) the violent storm that occurred on June 18, 1984, (5) the fact that many power lines were brought down throughout the area that day, and (6) the manner in which appellant responded to the emergency, it was his considered opinion that appellant did not comply with the NESC.

Appellees also called Stephen Horton, an employee of appellant's parent company, Centerior Energy, who testified that every downed wire is considered an emergency.

Appellees presented appellant's manual entitled "Principles of System Operation for the Transmission, Subtransmission, Distribution and Customer Services," which sets forth appellant's own published standards and contains a specific provision which details the way appellant is to conduct itself in a storm situation and states:

"Priority for Distribution Restoration.

"The removal of hazards and restoration of service in major and severe major storms or emergencies shall be as follows, but may be varied to reflect unusual situations:

"a. Remove all hazardous conditions (cut clear).

"b. Restore service to life support victims.

"c. Restore service to hospitals.

"d. Restore service to police and fire stations.

"e. Restore service to radio and television stations.

"f. Restore service to other critical customers.

> "For example: — Utilities
> "— Nursing Homes
> "— Daily Newspaper Plants
> "— Large Perishable Food and Pharmaceutical Warehouses
> "— Large Food Processing and Distribution Centers
> "— Schools
> "— Public Buildings, etc.

"g. Restore distribution circuit outages.

"h. Restore other primary wire outages.

"i. Restore other outages.

> "For example: — Secondary Distribution
> "— Service Drops, etc."

Upon cross-examination by appellees, Edward Brougher, appellant's chief dispatcher on the night of June 18, 1984, stated that downed wires are given the *highest* priority and that would have included the downed wire at West 28th and Church. Brougher testified that appellant's manual clearly establishes appellant's standards, which require that all hazardous conditions, *i.e.*, downed lines, be cut and cleared immediately to remove the hazard from the public before restoration of any service.[5] Restoring service, he stated, is a second priority, the order of which is set forth in the appellant's manual. In violation of appellant's admitted standards set forth in its manual, Brougher on cross-examination conceded that crews were kept on locations after cutting and clearing hazards to restore power even though there were still numerous downed lines throughout the area.

Appellant argues that its failure for over two hours to dispatch a crew to cut and clear the downed wire at West 28th and Church was not negligent behavior because appellant believed a CMHA police officer to be guarding the scene and because the number of downed wire calls exceeded the number of available repair crews.

Yet, construing the evidence in the light most favorable to appellees, we find that the number of crews available at the time appellant received the call from CMHA exceeded the number of downed wire calls and, further, that appellant was keeping its crews on locations after hazards had been cleared to restore power instead of immediately dispatching them after the hazard had been cleared to another downed wire site. Further, appellees' evidence also showed that appellant never verified with CMHA that someone was indeed guarding the wire and/or that someone would stay at the site until appellant

---

**5.** The record indicates that cutting and clearing a wire is a short procedure, which takes approximately five to fifteen minutes.

arrived.[6] Brougher stated that it was his experience that when a report of a downed wire is called in by safety forces, they would stand by and guard the wire until appellant arrived. However, Brougher's testimony revealed that he did not know if CMHA had ever guarded wires previously or whether CMHA was obligated to do so. Appellees' evidence showed that appellant never at a later time verified that someone was at the site. Construing the evidence in the light most favorable to appellees, we find that no obligation existed on CMHA's part to remain with the wire.

After a thorough examination of this record, and keeping in mind our standard of review under these assignments of error, we believe that appellees showed by substantial evidence that appellant violated its duty as enunciated in *Otte* and *Hetrick, supra,* by restoring service instead of first cutting and clearing *all* hazards. Secondly, appellees' evidence showed that appellant unreasonably assumed that CMHA would guard the scene until the repair crew arrived and that CMHA was capable, even if present at the scene, of protecting the public from this hazard. Appellees' evidence showed that the responsibility for downed wires rested solely with appellant. Appellees on this record demonstrated that appellant's obligation was to cut and clear all life-threatening hazards and then return to restore power in the priority its manual states. Appellees' evidence showed that appellant acted in contravention to its obligation by restoring service before all downed wires were cleared.

The trial court was correct in determining that, under the standard of review required for a judgment notwithstanding the verdict, there existed substantial evidence of probative value on this record which would permit reasonable minds to come to different conclusions upon determinative issues.

---

**6.** The telephone call of Linda Anderson, CMHA's dispatcher and appellant's employee who received the call in the dispatch office, was in its entirety as follows:

"BY MS. ANDERSON: Hi. We're from CMHA Police Department. Anderson speaking. Okay we have a live wire down.

"CEI: Okay.

"BY MS. ANDERSON: In the area of 28th and Church

"CEI: 28th and—?

"BY MS. ANDERSON: Church.

"CEI: Church.

"BY MS. ANDERSON: Right. That's the northeast corner.

"CEI: Northeast corner?

"BY MS. ANDERSON: Right. It's on the sidewalk and they say it's live. It's hot.

"CEI: Okay. What police department again.

"BY MS. ANDERSON: CMHA, Cuyahoga Metropolitan Housing.

"CEI: Yes. Okay.

"BY MS. ANDERSON: Okay?

"CEI: Uh-huh.

"BY MS. ANDERSON: Okay then. Thank you. Bye-bye."

The trial court did not err in overruling appellant's motion for judgment notwithstanding the verdict.

Because there existed sufficient evidence to defeat appellant's motion for judgment notwithstanding the verdict on the issue of appellant's negligence and because it is uncontested that appellees' decedent, Michael Wilburn, died as a proximate result of contacting the downed wire, appellant's first and second assignments of error are overruled.

## III

"The trial court erred in denying CEI's motion for new trial on the ground that the trial court erred in instructing the jury on punitive damages when plaintiffs presented no evidence of actual malice."

Appellant argues that its motion for new trial[7] should have been granted because the court erred in charging the jury on punitive damages. Appellant claims the court's instructions on punitives were unwarranted and as a result influenced the jury's deliberations on compensatory damages, leading them to believe they could award damages to punish appellant.

In *Preston v. Murty* (1987), 32 Ohio St.3d 334, 512 N.E.2d 1174, the court stated that punitive damages can be awarded in a civil tort action only where the defendant acted with "actual malice." The court defined "actual malice" as follows:

"Actual malice, necessary for an award of punitive damages, is (1) that state of mind under which a person's conduct is characterized by hatred, ill will or a spirit of revenge, *or* (2) a conscious disregard for the rights and safety of other persons that has a great probability of causing substantial harm." *Id.* at syllabus.

The Supreme Court, in discussing the second point of its syllabus, stated that " * * * before submitting the issue of punitive damages to a jury a trial court must review the evidence to determine if reasonable minds can differ as to whether the party was aware his or her act had a great probability of causing substantial harm. Furthermore, the court must determine that sufficient evidence is presented revealing that the party consciously disregarded the injured party's rights or safety." *Id.* at 336, 512 N.E.2d at 1176.

---

7. Appellant moved for a new trial pursuant to Civ.R. 59(A)(9), which states:

"(A) Grounds. A new trial may be granted to all or any of the parties and on all or part of the issues upon any of the following grounds:

" * * *

"(9) Error of law occurring at the trial and brought to the attention of the trial court by the party making the application."

■ We agree with appellant that given the record the instruction on punitive damages was unwarranted. We do not believe that sufficient evidence existed which showed that reasonable minds could differ as to whether appellant consciously disregarded the injured party's rights or safety.

■ However, we are unpersuaded that the instruction requires a new trial. The jury returned a separate verdict of no punitive damages. They specifically rejected the charge and chose instead to award solely compensatory damages. We cannot see how this error prejudiced appellant. Appellant's argument that the jury's verdict of $500,000 for the pain and suffering of decedent represented the jury's purpose of punishing appellant is speculative and lacking in a rational foundation. To affirm appellant's argument we would have to speculate as to the basis of the damage award and second-guess the jury on factors that may or may not have contributed to its decision. Appellant's argument contradicts the jury's express finding of no punitive damages. Appellant has not presented any reasons for us to believe that the jury did not reject the punitive damage instruction or that they were adversely influenced by it.

The assignment of error is without merit.

## IV

"The trial court erred in denying CEI's motion for new trial on the ground that the $500,000 verdict for seconds of pain and suffering was so excessive as to appear to have been awarded as a result of passion and prejudice, and was so manifestly against the weight of the evidence as to show a misconception by the jury of its duties."

■ Appellant, in its fourth assignment of error, argues that the award of $500,000 to the estate of Michael Wilburn for his brief pain and suffering was excessive and awarded as a result of passion and prejudice.

Appellant argues that the compensatory damage award was dramatically inflated as a result of appellees' counsel's remarks in closing argument where he encouraged the jury to "send a message" to appellant. Appellant claims that appellees' statement to "send a message" had a punitive component which led the jury to believe it could punish appellant. Thus, appellant concludes that because the verdict bears no relation to the pain endured by the decedent, the award is excessive and the result of the jury's passion and prejudice.

Appellant's argument is not well taken. We note initially that appellant never objected to these complained of remarks. An appellate court need not consider an alleged error which a complaining party failed to object to at trial.

*State v. Williams* (1977), 51 Ohio St.2d 112, 5 O.O.3d 98, 364 N.E.2d 1364. Secondly, reviewing the remarks in the context of the argument, it is plausible that counsel was arguing that the jury should "send a message" that when one negligently causes the death of another, compensation of the victim is required. Lastly, the jury, as we previously discussed, specifically rejected punitive damages. Because punitive damages were rejected, we cannot say this award was the result of passion and prejudice. The issue in this case is whether the trial court was correct in determining that the size of the verdict did not warrant a new trial.

Appellant asserts that appellees' decedent suffered a short period of time and that the $500,000 award for pain and suffering was grossly excessive, unsupported and warranted a new trial. Initially we note that the record shows the compensatory award included medical, funeral and burial expenses as well as pain and suffering.[8] Our inquiry is focused on whether the amount awarded for pain and suffering was cause for a new trial.

The assessment of damages is a matter within the province of the jury. *"There is no specific yardstick for determining the amount of damages to be awarded for pain and suffering or disability.* The jury's determination of damages should not be set aside unless the damages awarded were so excessive as to appear to have been awarded as a result of passion or prejudice, or unless the amount is so manifestly against the weight of the evidence as to show a misconception by the jury of its duties. *Toledo, C & O. River Road Co. v. Miller* (1923), 108 Ohio St. 388, 389 [140 N.E. 617]." (Emphasis added.) *Carter v. Simpson* (1984), 16 Ohio App.3d 420, 16 OBR 490, 476 N.E.2d 705.

Appellees' evidence showed that when Michael Wilburn grabbed the downed wire, four thousand two hundred volts of electricity passed through his body and that he spun in a circle three times, violently shaking, unable to release the wire, shouting, "Help me, help me." Michael Wilburn, his hands frozen on the wire and holding the wire against his chest, collapsed onto the ground. George Nowicki, an EMS technician involved in Michael's rescue, stated that for a short time after being removed from the wire Michael appeared to be jerking. According to eyewitness testimony, Michael's chest and shoes were smoking and Michael was lying on his back holding the wire, unable to release it.

---

**8.** Plaintiff's Exhibit 35, the "Statement of Funeral Goods and Services Selected," showed a balance due of $1,333. Plaintiff's Exhibit 42, the hospital bill showed charges in the amount of $5,416.05. We note that no jury interrogatories were requested by appellant to ascertain the exact breakdown of damages.

Appellees' evidence showed that when someone comes in contact with a power line there is a period of time in which the individual experiences pain. Appellees' evidence showed that, while Michael was conscious, he experienced an "intense" burning feeling.

According to John Kulic, an Emergency Medical Technician who witnessed the electrocution, Michael's fingers and hands appeared to be melted away. Mr. Kulic, who was involved in Michael's rescue, testified that Michael's pants were smoldering and Michael was burned on the head, buttocks, chest and abdomen. George Nowicki stated that Michael was severely burned over a great part of his body and was still on fire in the ambulance. Nowicki stated that Michael's hands were not intact and that his fingers were melted. His hands, arms, chest and backside were severely burned, Nowicki testified. The hospital medical records indicate that Michael suffered severe electrocution burns to his hands and right foot, both arms, left buttock, left calf and upper thigh. Michael also had some burns to the anterior chest and over the right scapula. The record shows that Michael's injuries were so extensive and so severe that amputation of Michael's arms and possibly his right leg may have resulted had he lived.

Appellees presented substantial evidence that showed Michael experienced anguish and intense burning pain prior to lapsing into unconsciousness.

We cannot say that the jury's verdict in this instance was excessive. The record establishes that Michael was conscious long enough to spin around three times yelling, "Help me, help me," while he felt four thousand two hundred volts of electricity burn through his body, catching his clothes on fire and causing the injuries we have discussed.

The amount awarded was not the result of passion or prejudice, nor was "the amount * * * so manifestly against the weight of the evidence as to show a misconception by the jury of its duties." *Carter, supra,* 16 Ohio App.3d at 423, 16 OBR at 494, 476 N.E.2d at 709.

The assignment of error is overruled.

## V

"The trial court erred in denying CEI's motion for a remittitur, and this court should itself order a remittitur if it does not order a new trial."

Appellant again argues that the damage award of $500,000 was excessive and asks this court, if a new trial is not ordered, to reduce the award by ordering a remittitur.

As discussed in the previous assignment of error, there is nothing in the record to suggest that the verdict was influenced by passion or prejudice, nor

is there any indication that this award was unsupported by the evidence. The appellant's claim that it is entitled to a remittitur is unsubstantiated.

The assignment of error is overruled.

The judgment is affirmed.

*Judgment affirmed.*

JAMES D. SWEENEY and BLACKMON, JJ., concur.