DECISION AND JUDGMENT ENTRY
{¶ 1} This appeal comes to us from a summary judgment issued by the Lucas County Court of Common Pleas, in a wrongful death action. Because we conclude that material issues of fact remain in dispute and appellee was not entitled to judgment as a matter of law, we reverse in part and affirm in part.
 {¶ 2} Appellant, Sandra Brady-Fray, is the administrator of the estate of her brother, Steven P. Kampfer. In September 1999, appellant filed a wrongful death suit against appellee, Toledo Edison Company ("Edison"). The suit stemmed from an incident in which Kampfer was electrocuted while trimming a dead tree which extended over the swimming pool in his backyard. In October 2000, appellant filed an amended complaint to include appellee, Asplundh Expert Tree Company ("Asplundh"). In February 2002, appellees each filed a motion for summary judgment. Appellant replied in opposition to both motions. The following evidence was presented by the parties in deposition testimony.
Kampfer owned two houses in Toledo, Ohio, located adjacent to each other, with an alley near the edge of the properties. He lived in one house with his children and girlfriend and rented the other out to Katherine Kreais. Several trees grew along the fence area between the two homes. One tree growing in Kreais's yard had some dead branches which hung over the fence and Kampfer's backyard. Approximately nine wires, including television cable, telephone, and four electric lines ran through these trees. In 1998, Kampfer installed an above-ground swimming pool. Since his own and neighborhood children swam in the pool, he became more concerned about the danger of the dead branches breaking and bringing electric lines into the pool. Kreais and other neighbors said that they often saw sparking in the trees in the alley, including the dead limbs of the tree hanging over the pool. Many of these people allegedly called Edison to report the arcing and sparking of the trees.
 {¶ 3} According to some witnesses, Kampfer called the city of Toledo to request that the tree be trimmed. A city forestry division inspector looked at Kampfer's dead tree branches and determined that, although the tree needed trimming, it was not in the city right-of-way. He told Kampfer to notify Toledo Edison to get it trimmed. Over the next year, Kampfer allegedly called Toledo Edison numerous times to report the problem. According to his girlfriend and neighbors, Kampfer spoke often of his frustration that Edison did not respond. Testimony was offered that Kampfer had called to have Edison temporarily turn off the power while he trimmed the branches, but Edison denied the request. Kampfer ran a small construction business, doing siding work on houses and sometimes trimming trees. He often operated a lift machine, known as a cherry picker or, more specifically, a Sky Genie. Since he had rented a Sky Genie to work on two other jobs, on August 6, 1999, Kampfer and his 19 year-old helper, Ronnie Shufelt, decided to use the cherry picker to trim the dead tree branches hanging over his pool.
 {¶ 4} Kampfer and Shufelt were wearing rubber soled tennis shoes; Kampfer was also wearing a hard hat. According to Randal Davenport, who watched through the kitchen window of a neighboring home, the two men raised themselves up in the bucket of the Sky Genie. Shufelt was assisting by holding the limbs while Kampfer used a chain saw to cut the limbs in three to four foot lengths at a time. Davenport stated that Kampfer had expressed his concern to him the day before that the tree limbs would drag electrical wires into the pool. Kampfer also expressed frustration with Toledo Edison in not trimming the tree or responding to his phone calls and had commented about the arcing of the power lines in the branches.
 {¶ 5} Davenport, who had experience with trimming trees, said the two men cut branches, both live and dead, from the trees near the power lines for about a half hour. According to Davenport, the Sky Genie was several feet away from the wires. He stated that he suddenly saw Shufelt start screaming and realized there was a problem. Davenport went immediately over to see if he could help. He assisted in lowering the Sky Genie and getting Kampfer out of the bucket. Meanwhile an ambulance arrived and transported Kampfer to the hospital, where he died several days later. Shufelt survived with only minor injuries.
Appellant's expert, John St. Clair, testified that he had reviewed the various depositions of witnesses, neighbors, Edison and Asplundh employees, Edison's records and tree trimming requirements, and the contract with Asplundh. St. Clair noted that two of the three lower lines near Kampfer and Shufelt were household service lines of 120 volts. The power line which ran several feet above them and the Sky Genie was a primary line, carrying 7,200 volts. St. Clair noted that the uninsulated 7,200 volt line had only been trimmed with a one foot clearance.[1]
Since, according to Edison's own standards, this was the clearance for insulated lines, St. Clair opined that Edison had breached its duty to maintain its equipment by failing to inspect Asplundh's work and to trim the trees according to Edison's specifications. He also concluded that while Kampfer and Shufelt may have appreciated that they were working around live household electric lines, they did not appreciate the danger of the uninsulated 7,200 volt primary line which hung above the area where they were working. According to St. Clair, the men came in contact with the primary line, most likely through a live branch. He also stated that he did not find fault with the way they were cutting the tree limbs. St. Clair stated that Edison and Asplundh simply failed to properly trim around the trees and to remove the dead branches which were hazardous.
 {¶ 6} Appellee offered testimony from employees and from its own expert to support its motion for summary judgment. Edison records failed to show any trouble calls from Kampfer or his request to turn off the power. Edison and Asplundh representatives stated that they had cut the trees as required and had no notice of any problem with the dead tree limbs over Kampfer's pool. Ultimately, the trial court granted summary judgment in favor of both Edison and Asplundh, stating that Kampfer's actions constituted "primary assumption of the risk," thus, barring all of appellant's claims.
 {¶ 7} Appellant now appeals that judgment, setting forth the following three assignments of error:
 {¶ 8} "1. The trial court erred in granting defendants' motions for summary judgment on the basis of primary assumption of the risk.
"2. The trial court erred in granting defendant's motion to strike `certain hearsay' evidence.
 {¶ 9} "3. The trial court erred in granting defendant's motion to strike the testimony and opinions of plaintiff's expert PH.D. psychologist."
 I. {¶ 10} Appellant, in her first assignment of error, argues that the trial court erred in granting summary judgment against appellant based upon the doctrine of primary assumption of the risk.
 {¶ 11} The standard of review of a grant or denial of summary judgment is the same for both a trial court and an appellate court.Lorain Natl. Bank v. Saratoga Apts. (1989), 61 Ohio App.3d 127, 129. Summary judgment will be granted if "the pleading, depositions, answers to interrogatories, written admissions, affidavits, transcripts of evidence in the pending case, and written stipulations of facts, if any, * * * show that there is no genuine issue as to any material fact" and, construing the evidence most strongly in favor of the non-moving party, reasonable minds can only conclude that the moving party is entitled to judgment as a matter of law." Civ.R. 56(C). An appellate court reviews summary judgments de novo and without deference to the trial court's determination. Brown v. Cty. Commrs. (1993), 87 Ohio App.3d 704, 711;Coventry Twp. v. Ecker (1995), 101 Ohio App.3d 38, 41.
 {¶ 12} Under Ohio law there are three types of assumption of the risk: express, primary, and implied. Express assumption of risk arises "where a person expressly contracts with another not to sue for any future injuries which may be caused by that person's negligence."Anderson v. Ceccardi (1983), 6 Ohio St.3d 110, 114. Primary assumption of risk "`is really a principle of no duty, or no negligence, and so denies the existence of any underlying cause of action.'" Gallagher v. ClevelandBrowns Football Co. (1996), 74 Ohio St.3d 427, 431, citing Prosser 
Keeton, Law of Torts (5 Ed. 1984) 496-497, Section 68. Primary assumption of the risk is generally applied in cases in which the defendant owes no duty to the plaintiff as a matter of law, and acts as an absolute bar to a claim of negligence because some known risks are unavoidably inherent in certain activities, like contact sports. See Cincinnati Base Ball ClubCo. v. Eno (1925), 112 Ohio St. 175; Ferguson v. Cincinnati Gas Elec. Co. (1990), 69 Ohio App.3d 460, 462.
 {¶ 13} In contrast, implied assumption of the risk requires that a plaintiff consent to, or acquiesce in, an appreciated or known risk, or involves a risk so obvious that the plaintiff must have known and appreciated it. Benjamin v. Deffet Rentals (1981), 66 Ohio St.2d 86, 89. In implied assumption of risk cases, the defendant owes plaintiff a duty; however, because plaintiff knew of the danger involved and intelligently acquiesced to it, plaintiff's claim is barred. Anderson, supra, at 113. Nevertheless, with the enactment of R.C. 2315.19, the comparative negligence statute, the defense of implied assumption of risk merged with the defense of contributory negligence. Id. at paragraph one of the syllabus. Since R.C. 2315.19 requires apportionment of the relative degrees of fault between plaintiff and defendant, questions concerning implied assumption of risk are generally for the jury to determine, especially when there is conflicting evidence as to plaintiff's contributory negligence. Collier v. Northland Swim Club
(1987), 35 Ohio App.3d 35, 39. Only in instances where there is no dispute as to any material fact and "the plaintiff's negligence was so extreme as a matter of law that no reasonable person could conclude that plaintiff was entitled to recover" is the granting of summary judgment appropriate. Id.
 {¶ 14} In this case, the record shows that Toledo Edison did, in fact, have a duty to maintain its equipment and power lines, keeping them free of potentially dangerous tree limbs and vegetation. A company engaged in the transmission and distribution of electrical current has a duty "to exercise the highest degree of care consistent with the practical operation of its business in the construction, maintenance and inspection of its equipment." Otte v. Dayton Power Light Co.
(1988), 37 Ohio St.3d 33, 38; Hetrick v. Marion-Reserve Power Co. (1943), 141 Ohio St. 347, 355; Brauning v. Cincinnati Gas Elec.Co. (1989), 54 Ohio App.3d 38, 40. Although Kampfer may have been involved in a dangerous activity by working in an uninsulated cherry picker around electrical power lines, the risk was not so inherent as to be incapable of elimination. See Ferguson v. Cincinnati Gas Elec.Co., supra. Therefore, we conclude that the doctrine of primary assumption of the risk is not applicable here.
 {¶ 15} Rather, the issue in this case is whether Kampfer impliedly assumed the risk by consenting to or acquiescing in an appreciated, known, or obvious risk to his safety and, if so, whether his actions constituted negligence so extreme so as to prevent recovery. In order to establish a cause of action in negligence, plaintiff bears the burden of proving that (1) defendant owed a duty of reasonable care towards the plaintiff; (2) that the defendant breached its duty of reasonable care; and (3) that the plaintiff suffered injuries proximately caused by the breach. Strother v. Hutchinson (1981), 67 Ohio St.2d 282, 285; Fischerv. Dairy Mart Conv. Stores (1991), 77 Ohio App.3d 543, 551; Wilburn v.Cleveland Elec. Illum. Co. (1991), 74 Ohio App.3d 401, 406.
 {¶ 16} The record shows that material issues of fact are in dispute on several points. First, there is conflicting evidence as to Toledo Edison's alleged breach of its duty to remove dead tree limbs and the hazard they represented. Although no company records were provided that could establish Kampfer's or other parties' phone calls requesting removal of the limbs, testimony was given that such calls were made repeatedly during the year prior to Kampfer's electrocution. In addition, there is some evidence that the tree in the alley was reportedly arcing or sparking and that uninsulated power lines were in contact with the tree limbs overhanging Kampfer's pool and backyard. Evidence was presented that the dead limbs had been in existence for at least a year before the incident.
 {¶ 17} It is also undisputed that Edison contracted with Asplundh to trim trees in the area of the Kampfer properties. Facts are in dispute as to whether or not Asplundh breached its contractual duty by allegedly failing to notice or properly assess the need to cut the dead limbs from the tree near Kampfer's pool. Although denied by both the tree contractor and Edison, evidence was presented which supports that Toledo Edison, through its own inspectors and an independent contractor, Asplundh, may have overlooked or misjudged the hazard the dead tree limbs represented. Further, it is disputed as to whether Edison properly inspected Asplundh's work or assessed the need for trimming of the tree. Thus, in our view, there remain material issues in dispute over whether Edison breached its duty to maintain its lines and equipment and whether Asplundh was negligent in the performance of its contractual obligations.
 {¶ 18} Concerning Kampfer's alleged negligence, conflicting evidence was also presented regarding Kampfer's appreciation of the risk of the power lines. Although Kampfer apparently had some training in electrical matters, it is unclear exactly what that entailed or whether he knew and appreciated that one of the wires was a higher voltage than the others. Plaintiff's expert said that even if Kampfer knew the line voltages, he did not recognize a hazard since he was not working near the higher voltage line. Furthermore, it is unclear why the electrical charge occurred. According to the eyewitness, Kampfer and Shufelt cut branches in close proximity to the power lines for approximately 30 minutes before the fatal discharge occurred. The witness stated that he did not see any part of the cherry picker or either of the men actually touch any electrical line. Evidence was presented that, unless wet, dead tree limbs are poor conductors of electricity. Plaintiff's expert and the eyewitness both testified that Kampfer and Shufelt had been acting appropriately. Therefore, whether the men were acting in a negligent manner by cutting the tree limbs is in dispute and is a matter for the jury.
 {¶ 19} Therefore, we conclude that granting summary judgment on the basis that Kampfer primarily assumed the risk of injury is not appropriate under the facts in this case. Kampfer's alleged negligence, if any, must be weighed by the trier of fact against any alleged negligence of Toledo Edison and Asplundh. Consequently, we conclude that the trial court improperly granted summary judgment in favor of Toledo Edison and Asplundh.
 {¶ 20} Accordingly, appellant's first assignment of error is well taken.
 II. {¶ 21} Appellant, in her second assignment of error, contends that the trial court erred in striking certain statements as "hearsay." We agree.
 {¶ 22} For evidentiary material attached to a summary judgment motion to be considered, the evidence must be admissible at trial. See, generally, Hall v. Fairmont Homes, Inc. (1995), 105 Ohio App.3d 424,436. Generally, the admission or exclusion of evidence rests in the trial court's sound discretion and will not be reversed absent an abuse of that discretion. See Bostic v. Connor (1988), 37 Ohio St.3d 144. In order to find an abuse of discretion we must determine that the trial court's decision was unreasonable, arbitrary or unconscionable and not merely an error of law or judgment. Blakemore v. Blakemore (1983), 5 Ohio St.3d 217,219.
 {¶ 23} Evid.R. 804(5) provides that a statement of a deceased person is not excluded by the hearsay rule "where (a) the estate or personal representative of the decedent's estate * * * is a party, and (b) the statement was made before the death * * *, and (c) the statement is offered to rebut testimony by an adverse party on a matter within the knowledge of the decedent * * *." See, also, Testa v. Roberts (1988),44 Ohio App.3d 161 (804(5) permits a decedent to "speak from the grave" and rebut an adverse party's testimony for the benefit of the decedent's representative); Simandl v. Schimandle (1982), 3 Ohio App.3d 357.
 {¶ 24} In this case, appellee's motion for summary judgment challenges the reasonableness of Kampfer's actions and asserts that Toledo Edison had no duty to protect Kampfer. In our view, Kampfer's statements to others regarding his alleged frustration and previous attempts to contact Toledo Edison to resolve the issue of the dead tree branches are admissible under Evid.R. 804(5). Since Toledo Edison's trouble call records may not be complete, without these statements, appellant's ability to establish notice and to rebut appellee's claims would be severely impaired. Therefore, we conclude that the trial court abused its discretion in excluding Kampfer's statements about calling Toledo Edison.
 {¶ 25} Accordingly, appellant's second assignment of error is well-taken.
 III. {¶ 26} Appellant, in her third assignment of error, contends that the trial court erred in excluding expert psychological testimony regarding Kampfer's state of mind and reasonableness of his actions.
 {¶ 27} Evid.R. 702 provides that expert testimony may be admitted if all the following apply:
 {¶ 28} "(A) the witness' testimony either relates to matters beyond the knowledge or experience possessed by lay persons or dispels a misconception common among lay persons;
"(B) The witness is qualified as an expert by specialized knowledge, skill, experience, training, or education regarding the subject matter of the testimony;
 {¶ 29} "(C) The witness' testimony is based on reliable scientific, technical, or other specialized information. * * *."
 {¶ 30} In this case, appellant sought to admit evidence that Kampfer's fears and actions were reasonable for a normal person. The psychologist had no relationship with Kampfer prior to his death and the testimony did not reveal any special mental or psychological condition which would have affected Kampfer's thinking or actions. Thus, we need not look beyond the first requirement to determine that any information offered by the psychologist is not beyond the knowledge of lay persons. Therefore, the psychological expert testimony was properly excluded by the trial court.
 {¶ 31} Accordingly, appellant's third assignment of error is not well taken.
 {¶ 32} The judgment of the Lucas County Court of Common Pleas is affirmed in part and reversed in part, and remanded for proceedings consistent with this decision. Court costs of this appeal are assessed to appellees.
JUDGMENT AFFIRMED IN PART AND REVERSED IN PART.
A certified copy of this entry shall constitute the mandate pursuant to App.R. 27. See, also, 6th Dist.Loc.App.R. 4, amended 1/1/98.
Peter M. Handwork, P.J. and Arlene Singer, J. CONCUR.
Judith Ann Lanzinger, J., dissents in part and concurs in part.
[1] Edison standards required uninsulated lines in trees to be trimmed with a much larger clearance, or needed a "sleeve" to protect the wire.