OPINION
{¶ 1} Defendants/third-party plaintiffs-appellants/cross-appellees United Pipeline, Ltd and David Eigel (hereinafter collectively "UPL") appeal the August 4, 2005, January 10, 2006 and January 19, 2006 Judgment Entries of the Stark County Court of Common Pleas, granting summary judgment in favor of third-party defendants-appellees/cross-appellants Edward D. Fleeman and Edward D. Fleeman, Inc. (hereinafter collectively "Fleeman") on all the claims, except UPL's conversion claim and Fleeman's claim for defamation, and granting Fleeman's motion for judgment notwithstanding the verdict and conditionally granting a motion for a new trial. Third-party defendants-appellees/cross-appellants Edward D. Fleeman and Edward D. Fleeman, Inc. cross-appeal the trial court's denial of their motion for summary judgment as to UPL's claim for conversion and the denial of their motion for a new trial on their defamation claim.
 STATEMENT OF THE FACTS AND CASE I. Facts {¶ 2} UPL was formed in 1995 to target communities without natural gas services and determine whether there was sufficient homeowner interest in receiving natural gas. If so, UPL would assist in the formation of a non-profit, member-owned cooperative to serve the community. UPL would then enter into a management agreement with the cooperative relative to the construction of the natural gas pipeline system, contract for gas supply and transportation, and service of the cooperative's pipeline system. UPL derived its income from delivery and monthly servicing fees.
 {¶ 3} Fleeman was a resident of the Lake Mohawk, Ohio, community and had over thirty years of experience in the Ohio Natural Gas Industry. He began to investigate ways in which to provide natural gas services to the Lake Mohawk area in 1992, and made contacts with numerous people in the natural gas industry. In 1995, UPL hired Fleeman to be in charge of its daily operations.
 {¶ 4} Fleeman was primarily responsible for the development of the business model, management agreements, assignments, and other written documents and procedures under which UPL developed its cooperative business. From 1995 to 1998, Fleeman was employed by UPL and was not subject to a non-competition agreement or any written agreement concerning protection of alleged trade secrets or alleged confidential information.
 {¶ 5} On November 9, 1998, Fleeman entered into a written employment agreement with UPL. The Agreement provided, in pertinent part, as follows:
 {¶ 6} "NOW, THEREFORE, for and in consideration of the mutual promises, covenants and obligations contained herein, UPL and Employee [Fleeman] agree as follows:
 {¶ 7} "* * *
 {¶ 8} "8. (a) The Employment Period, the Employee salary. [sic] and any and all other rights of the Employee under this Agreement or otherwise as an employee of UPL shall terminate (except as to salary and other rights accrued prior to such termination): (1) upon the death of the Employee; (2) upon the physical or mental disability of the Employee (as defined in paragraph 8(b) below); (3) for cause; or (4) if Employee's job position is eliminated by the Board of Managers of UPL, all immediately upon the giving of written notice thereof by UPL to the Employee or at such later time as such notices may specify. Notwithstanding any provision hereof, in the event Employee is terminated pursuant to subparagraph 8.(a)(4) herein, UPL shall continue payment to Employee of the salary stated herein for the remainder of the term of this Agreement.
 {¶ 9} "* * *
 {¶ 10} "(c) For purposes of this Agreement, the term "for cause" shall be deemed to mean (i) the indictment of any crime, (ii) the commission or attempted commission of any willful misconduct or dishonesty, malfeasance, or omission, (iii) gross negligence, or (iv) the material breach of any provision hereof or of any other agreement between UPL and Employee.
 {¶ 11} "9. (a) Employee acknowledges that (i) during the Employment Period and as part of his employment, Employee will be afforded access to Confidential Information of UPL; (ii) public disclosure of such Confidential Information could have a material adverse effect on UPL and its business; and (iii) UPL has required that the Employee make the covenants and agreements set forth in this paragraph 9 as condition to its continuing to employ Employee and Employee is willing to do so. Employee acknowledges that the provisions of this paragraph 9 are reasonable and necessary with respect to the improper use or disclosure of Confidential Information.
 {¶ 12} "(b) As used in this agreement, the term "Confidential Information" shall mean ideas, plans, processes, techniques, technology and trade secrets, customer lists and other information developed or acquired by or on behalf of UPL which relate to or affect any aspect of UPL's business and which information is not available to the general public.
 {¶ 13} "(c) In consideration of the foregoing and of continued employment by UPL and the compensation and benefits paid and provided and to be paid or provided to Employee by UPL, Employee hereby covenants and agrees that both during and after the Employment Period for so long as Employee is subject to acovenant not to compete, Employee shall not, without UPL's prior written consent, disclose to any third party, or use for any purpose other than for the exclusive benefit of UPL, any Confidential Information, whether Employee has such informationin his memory or embodied in writing or other physical form.
(emphasis added).
 {¶ 14} "(d) Employee agrees that disclosures made by UPL to governmental authorities, to its customers or potential customers, to its suppliers or potential suppliers, to its contractors or potential contractors, to its employees or potential employees, to its owners to potential owners, to its consultants or potential consultants, or disclosures made by UPL in any litigation or administrative or governmental proceeding shall not mean that the matter so disclosed is available to the general public. Employee shall not remove from UPL's premises, except when authorized and necessary in the pursuit of UPL's business, any document, record notebook, plan, maps, or other instruments, all of which shall be the exclusive property of UPL. In the event of the termination of Employee's employment with UPL, or upon the earlier request by UPL, the Employee shallreturn to UPL all such records and documents and shall not retainany copies of the same. (emphasis added)
 {¶ 15} "* * *
 {¶ 16} "10. (a) Except as provided in subparagraph 10.(b) hereof, Employee agrees that so long as he is an employee of the Company, and for two years after he ceases to be an employee of the Company, he shall not directly or indirectly compete with or engage in, assist, have an active interest in or become an employee of any business organization or other entity which directly competes with the Company or provides the same services as the Company then provides, has provided, or has under development. This agreement not to compete shall be effective within the State of Ohio, and each other state in which the Company has operated or in which the Company has qualified to do business. The Employee agrees that the Company may enforce this agreement by injunction and that if Employee violates this agreement he shall reimburse the Company for all costs and expenses incurred to enforce this agreement, including reasonable attorneys fees.
 {¶ 17} "(b) The foregoing covenant and agreement not to compete shall not apply if the Employee ceases to be an employee of the Company because (1) he is terminated by the Companywithout cause, (2) he is terminated because his position was eliminated by the Company, or (3) at the end of either the initial term or any renewal term hereof, the Company elects not to offer the Employee an extension of this Employment Agreement or a replacement Employment Agreement, provided, however, that if at such time the Company is willing to continue or replace the Employment Agreement but the Company and Employee cannot come to agreement as to its terms then the foregoing covenant and agreement not to compete shall continue to apply. (emphasis added)
 {¶ 18} "* * *
 {¶ 19} "12. This agreement contains the entire agreement of the parties relating to the subject matter hereof, and the parties have made no agreements representations or warranties relating to the subject matter of this Agreement that are not set forth herein. This Agreement may be amended at any time by the written agreement of both parties, but it shall not be amended by oral agreement. The failure of either party to insist in any instance on the strict performance of any provision of this Agreement or to exercise any right hereunder shall not constitute a waiver of such provision or right in any other instance."
 {¶ 20} Prior to executing the Agreement, Fleeman entered into two separate stock option agreements on July 15, 1998, and September 30, 1998. Similar to the provisions contained within the Employment Agreement, the stock option agreements provided covenants not to compete and proprietary rights clauses. The stock options also mirrored the provisions in the Agreement, whereby the covenants not to compete and proprietary rights clauses did not apply if Fleeman was terminated for his employment with UPL without cause or as a result of the elimination of his position. The stock option agreements also contained a provision for the return of documents similar to the Employment Agreement.
 {¶ 21} In April 2001, Fleeman was terminated from his employment with UPL without cause due to a lack of funding for UPL's business. Subsequent thereto, Fleeman formed Edward D. Fleeman, Inc. (hereinafter "EDF"), an Ohio corporation. Fleeman informed Eigel and UPL that EDF would be competing against it and EDF had entered into a Management Agreement with Commonwealth Energy Cooperative Association, Inc. ("Commonwealth"), a UPL prospective customer. Although UPL had set-up Commonwealth, due to a lack of funding, UPL did not enter into a Management Agreement with Commonwealth. Eigel, on behalf of UPL, sent a letter dated February 1, 2002, to John Reed, a member of the board of directors of Commonwealth, explaining Fleeman had been terminated from his employment with UPL due to a lack of funding and although UPL/Eigel were aware EDF was using UPL's materials to manage Commonwealth, they did not intend to stop such use.
 {¶ 22} In the years 2002 and 2003, Fleeman solicited and obtained business in the gas cooperative arena, most notably the Pocono Project and the Ottoville/Ft. Jennings Project. During the time Fleeman was employed with UPL, UPL pursued the development of gas distribution systems in Ottoville, Ohio and Ft. Jennings, Ohio.
 {¶ 23} On December 15, 2005, Midwest Energy Consultants, LLC and Lee Grabill filed a complaint against United Pipeline, Ltd. and David Eigel seeking compensation on a commission basis under a contract with UPL. On January 24, 2004, UPL and Eigel filed an answer and counterclaimed alleging Midwest breached the agreement and tortiously interfered with its business relations with present and potential customers.
 {¶ 24} UPL filed a third-party complaint against Fleeman alleging tortious interference with business relations; violation of a confidentiality agreement; violation of the Ohio Trade Secrets Act; breach of stock option agreement; breach of fiduciary duties; unfair competition; civil conspiracy and conversion. On April 1, 2004, Fleeman filed an answer to the third-party complaint and cross-claimed against UPL and Eigel, alleging defamation.
 {¶ 25} All the parties, except Midwest, filed motions for summary judgment. Prior to the ruling on the motions, Midwest and Grabill settled their claims against UPL and Eigel.
 {¶ 26} Via Judgment Entry of August 4, 2005, the trial court denied UPL's motion for summary judgment on the defamation claim, and granted Fleeman's motion on all claims except for UPL's conversion claim.
 {¶ 27} A jury trial commenced on August 10, 2005. During trial, the trial court reconsidered its summary judgment ruling on UPL's claim for breach of the stock option agreement, and submitted the claim to the jury. The jury returned a verdict in favor of UPL and Eigel on their claim for conversion in the amount of $250,000 compensatory damages and $100,000 in punitive damages. As to Fleeman's claim for defamation, the jury found in favor of Fleeman in the amount of $300 compensatory damages and $500 in punitive damages.
 {¶ 28} Fleeman moved the trial court for judgment notwithstanding the verdict, or, in the alternative, for a new trial. UPL filed a motion with the trial court to enter judgment on the verdict. On January 19, 2006, via Judgment Entry, the trial court granted the JNOV motion as to the verdict for UPL on the conversion claim and on the claim for breach of the stock option agreement, and conditionally granted the motion for a new trial on the conversion claim and the claim for breach of the stock option agreement in the event of reversal on appeal. The trial court denied the motion for a new trial on the defamation claim.
 {¶ 29} UPL appealed, and Fleeman filed a cross-appeal.
 {¶ 30} UPL assigns as error:
 {¶ 31} "I. THE TRIAL COURT ERRED IN GRANTING SUMMARY JUDGMENT TO EDF AND EDWARD FLEEMAN ON UPL'S CLAIM FOR BREACH OF CONTRACT.
 {¶ 32} "II. THE TRIAL COURT ERRED IN ENTERING JUDGMENT NOTWITHSTANDING THE VERDICT FOR EDF AND EDWARD FLEEMAN ON UPL'S CLAIM TO DEEM THE STOCK OPTION AGREEMENTS INVALID.
 {¶ 33} "III. THE TRIAL COURT ERRED IN ENTERING JUDGMENT NOTWITHSTANDING THE VERDICT FOR EDF AND EDWARD FLEEMAN ON UPL'S CLAIM FOR CONVERSION.
 {¶ 34} "IV. THE TRIAL COURT ERRED IN ENTERING JUDGMENT AWARDING A CONDITIONAL NEW TRIAL IF THIS COURT VACATES THE JUDGMENT NOTWITHSTANDING THE VERDICT."
 {¶ 35} In the first assignment of error, UPL argues the trial court erred in granting summary judgment to Fleeman on UPL's claim for breach of an employment contract when there was evidence Fleeman failed to perform his contractual obligation to return UPL's documents upon termination of his employment.
 {¶ 36} Our standard of review is de novo, and as an appellate court reviewing summary judgment motions, we stand in the shoes of the trial court and review summary judgments on the same standard and evidence as the trial court. Smiddy v. The WeddingParty, Inc. (1987), 30 Ohio St.3d 35, 30 OBR 78, 506 N.E.2d 212. Accordingly, an appellate court must independently review the record to determine if summary judgment was appropriate and need not defer to the trial court's decision. See Brown v. Scioto Bd.of Commrs. (1993), 87 Ohio App.3d 704, 711, 622 N.E.2d 1153;Morehead v. Conley (1991), 75 Ohio App.3d 409, 411-412,599 N.E.2d 786.
 {¶ 37} Civ.R. 56 provides:
 {¶ 38} "Summary judgment shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, written admissions, affidavits, transcripts of evidence in the pending case and written stipulations of fact, if timely filed in the action, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. * * * A summary judgment shall not be rendered unless it appears from such evidence or stipulation and only therefrom, that reasonable minds can come to but one conclusion and that conclusion is adverse to the party against whom the motion for summary judgment is made, such party being entitled to have the evidence or stipulation construed most strongly in the party's favor. * * *"
 {¶ 39} Pursuant to the above rule, a trial court may not enter summary judgment if it appears that a material fact is genuinely disputed. The party moving for summary judgment bears the initial burden of informing the trial court of the basis for its motion and identifying those portions of the record that demonstrate the absence of a genuine issue of material fact. The moving party may not make a conclusory assertion that the nonmoving party has no evidence to prove its case. The moving party must specifically point to some evidence which demonstrates the nonmoving party cannot support its claim. If the moving party satisfies this requirement, the burden shifts to the nonmoving party to set forth specific facts demonstrating there is a genuine issue of material fact for trial. Vahila v. Hall
(1997), 77 Ohio St.3d 421, 429, 674 N.E.2d 1164, citing Dresherv. Burt (1996), 75 Ohio St.3d 280, 293, 662 N.E.2d 264.
 {¶ 40} Appellant argues Fleeman breached his employment contract and the stock option contracts by failing to return documents to UPL pursuant to the agreements. UPL asserts its claim for breach of contract was included within court four of the third-party complaint, captioned "Misappropriation of Trade Secrets."
 {¶ 41} The document return provision of the Employment Agreement must be read in context with the remainder of the Agreement, permitting Fleeman to utilize the information contained therein.
 {¶ 42} Assuming arguendo the trial court erred in granting summary judgment as to appellant's claim for breach of the employment agreement, appellant is entitled to nominal damages only. The documents themselves have no economic value. Appellant did not introduce evidence as to the fair market value of the documents, and the only value of the documents inherently lies in the value of the information contained therein. State ex rel ThePlain Dealer v. Ohio Dept. of Ins. (1997) 80 Ohio St.3d 513;Brenting Enterprises v. Curran (2001) 141 Ohio App.3d 640; The common law action of conversion of this type of information has been superceded by the adoption of Ohio's Uniform Trade Secrets, R.C. 1331.61 et seq. The trial court granted summary judgment as to UPL's trade secret claim, and UPL does not appeal therefrom.
 II, III {¶ 43} Appellants/cross-appellees' second and third assignments of error raise common and interrelated issues; therefore, we will address the arguments together.
 {¶ 44} UPL maintains the trial court erred in granting judgment notwithstanding the verdict for Fleeman on UPL's claim for breach of the stock option agreements when UPL presented evidence Fleeman breached the agreements by failing to return UPL's documents after his employment ended.
 {¶ 45} UPL further argues the trial court erred in granting JNOV on UPL's claim for conversion when the conversion claim was not preempted by the Trade Secrets Act, and UPL presented competent and sufficient evidence on the value of the converted documents.
 {¶ 46} The standard of review for a ruling on a motion for judgment notwithstanding the verdict is the same one applicable to a motion for directed verdict. Posin v. A.B.C. Motor CourtHotel (1976), 45 Ohio St.2d 271, 275, 74 O.O.2d 427,344 N.E.2d 334. A motion for directed verdict or judgment notwithstanding the verdict is to be granted when, construing the evidence most strongly in favor of the party opposing the motion, the trial court finds reasonable minds could come to only one conclusion and that conclusion is adverse to the party opposing the motion. Civ.R. 50(A)(4); Crawford v. Halkovics (1982),1 Ohio St.3d 184, 185-186, 1 OBR 213. Our review of the trial court's disposition is de novo.
 {¶ 47} As discussed in our disposition of appellant/cross-appellee's first assignment of error, the documents themselves have no inherent value apart from the information contained therein. According to the language and pertinent provisions of both the Employment Agreement and the stock option agreements, the restrictive covenants did not apply. Fleeman could use the information without restriction as his employment was terminated without cause. Accordingly, the information contained in the documents could not be classified as trade secrets.
 {¶ 48} Additionally, if the information is alleged to have been "trade secrets," the common law action of conversion of this type of information has been superceded in the adoption of R.C. 1331.61 et seq., the Ohio Trade Secrets Act. We recognize the Ohio Trade Secrets Act does not supersede all possible variances of a claim for conversion. However, where, as here, the claim for conversion involves documentary property which inherently contains trade secrets; the Act necessarily supersedes such claims.
 {¶ 49} Based on the above, the value of the physical documents themselves is nominal, apart from the information contained therein. Any alleged conversion of the information contained within the documents has been preempted by the Ohio Trade Secrets Act.
 {¶ 50} Appellant's second and third assignments of error are overruled.
 IV {¶ 51} Based upon our disposition of appellants' second and third assignments of error, we find appellants/cross-appellees' fourth assignment of error moot.
 CROSS-APPEAL {¶ 52} We now turn our attention to appellees/cross-appellants' assigned errors on cross-appeal:
 {¶ 53} "I. DID THE TRIAL COURT ERR IN FAILING TO GRANT FLEEMAN AND EDF SUMMARY JUDGMENT WITH RESPECT TO UPL'S CLAIM FOR CONVERSION?
 {¶ 54} "II. DID THE TRIAL COURT ERR IN PERMITTING UPL AND FLEEMAN TO INTRODUCE PREJUDICIAL AND IRRELEVANT TESTIMONY REGARDING CONVERSION, WHICH TESTIMONY PREJUDICED THE JURY AND ENTITLES FLEEMAN AND EDF TO A NEW TRIAL ON THEIR DEFAMATION CLAIM?
 I {¶ 55} In the first assignment of error appellees/cross-appellant's argue the trial court erred in failing to grant their motion for summary judgment with respect to UPL's claim for conversion.
 {¶ 56} Based upon our disposition of appellants/cross-appellee's assigned errors above, we find the first assignment of error on cross-appeal moot.
 II {¶ 57} In their second assignment of error, appellees/cross-appellants assert the trial court erred in permitting UPL and Fleeman to introduce prejudicial and irrelevant testimony regarding conversion, which testimony prejudiced the jury and entitles appellees/cross-appellants to a new trial on their defamation claim.
 {¶ 58} However, appellees/cross-appellant's conclusory statement prejudice was incurred due to the jury's hearing testimony on the conversion claim is insufficient. Appellees/cross-appellants have not demonstrated evidence a substantial right has been affected by the introduction of the evidence. See Evid. R. 103(A). Accordingly, we overrule the assignment of error.
 {¶ 59} The judgment of the Stark County Court of Common Pleas is affirmed.
Hoffman, J., Wise, P.J. and Gwin, J. concur.
 JUDGMENT ENTRY
For the reasons stated in our accompanying Memorandum-Opinion, the judgment of the Stark County Court of Common Pleas is affirmed. Costs assessed to appellants/cross-appellees as to the direct appeal, and costs assessed to appellees/cross-appellants on the cross-appeal.