[Cite as *Burton v. Dutiel*, 2015-Ohio-4134.]

COURT OF APPEALS
PERRY COUNTY, OHIO
FIFTH APPELLATE DISTRICT

|  |  |  |
|---|---|---|
| KAYLA J. BURTON | : | JUDGES:<br>Hon. W. Scott Gwin, P.J. |
|  | : | Hon. John W. Wise, J. |
| Plaintiff-Appellee | : | Hon. Craig R. Baldwin, J. |
|  | : |  |
| -vs- | : |  |
|  | : | Case Nos. 14-CA-00024 |
| DONALD DUTIEL | : | 14-CA-00025 |
|  | : |  |
| Defendant-Appellant | : |  |
|  | : | O P I N I O N |

CHARACTER OF PROCEEDING:     Civil appeal from the Perry County Court of
                             Common Pleas, Case No. 10-CV-00410

JUDGMENT:                    Affirmed in part; Reversed and Remanded
                             in part

DATE OF JUDGMENT ENTRY:      October 2, 2015

APPEARANCES:

For Plaintiff-Appellee                  For Defendant-Appellant

BARTON KEYES                            ELIZABETH GABA
REX ELLIOTT                             1231 East Broad Street
2175 Riverside Drive                    Columbus, OH 43205
Columbus, OH  43221

*Gwin, P.J.*

{¶1} Appellant appeals the judgment by the Perry County Court of Common Pleas.

*Facts & Procedural History*

{¶2} On October 6, 2010, appellee Kayla Burton filed a complaint against appellant Donald Dutiel for assault, battery, intentional infliction of emotional distress, and punitive damages. Burton alleged in her complaint that Dutiel raped her on July 8, 2010.

{¶3} In September of 2012, Dutiel filed a motion to change venue due to pre-trial publicity. In a judgment entry, the trial court reserved ruling on the motion until such time as the jury panel was subjected to the voir dire process. Dutiel also filed a motion to convey him from prison to attend the trial. The trial court denied the motion. The trial court granted Dutiel's motion in limine to preclude Burton from introducing evidence of his no contest plea and resulting conviction for rape.

{¶4} Prior to trial, Burton filed a motion in limine to preclude Dutiel from introducing evidence as to her alleged sexual history and evidence or arguments related to Dutiel's theory that Burton's mother "orchestrated" the sexual assault. The trial court ruled that "irrelevant evidence, hearsay and evidence that will cause unfair prejudice, confusion of the issues or of misleading the jury will not be admitted" and granted Burton's motion "to the extent the evidence does any of this." The trial court further stated that testimony would be permitted based upon the rules of evidence. Finally, that evidence of Burton's alleged sexual activity or history were not admissible due to the danger of unfair prejudice, confusion of the issues, and misleading of the jury.

{¶5} The trial commenced on March 25, 2013. Burton testified that Dutiel was a family friend who she met in 2008 through her mother. Prior to July 8, 2010, she would say "hi" to him, but she never went anywhere alone with him and he never led her to believe he was interested in her. Burton stated that on July 8, 2010, Dutiel called her and asked if she would take him to look at a property he wanted to buy because his trucks were broken down. Burton agreed, and picked him up at his farm. Dutiel told her to take him to the house he owned on Maple Heights Avenue in New Lexington so he could get something.

{¶6} When Burton went into the house with Dutiel, he locked the door behind them and said he wanted to show her something in the kitchen. Burton testified that Dutiel began kissing her and though she told him "no" and "stop," he would not listen. Burton stated that Dutiel forced her onto the bed and, though she tried to push him, he was too strong, and took her clothes off and took his off. Burton testified that she kept telling Dutiel to stop, but he forced his penis inside her vagina. Burton did not scream or try to call for help because she was in shock and was afraid for her life. Burton stated that Dutiel subsequently asked her to take him to another property, which she did because she was scared and wanted to get away from him. Burton testified that when she dropped Dutiel off, he told her he would look her up so he could do it again.

{¶7} Burton then drove to Lancaster to meet her cousin and called her friend Shawn, who told her to go to the home of his uncle, Pastor Willie Syfert ("Syfert"). Burton's cousin took her to the pastor's house. Burton did not want to go to the police because she did not want people to find out what happened and did not want to go the hospital because she "felt like a lowlife." However, Burton's cousin and Syfert took

Burton to Fairfield Medical Center where the staff conducted a rape kit and tests, including blood work and a pelvic exam. The tests were embarrassing and painful to Burton. Burton made a police report the next day with Rick Cline ("Cline") of the New Lexington Police Department. Burton testified that, after the incident, Dutiel would drive past her work, which scared her. She obtained a protection order as a result.

{¶8} Burton testified that Exhibit 17 contains copies of her medical records since July 8, 2010 and the statements that she made in those records were for the purposes of treatment or diagnosis. Burton stated that some of the medical problems and issues she has experienced as a result of what Dutiel did to her include a sharp pain in her left side, ovary problems, and the need to obtain counseling. Burton testified that Exhibit 18 is a fair and accurate copy of her medical bills since July 8, 2010. When asked how the event on July 8, 2010 has impacted her life, Burton stated that when it happened, she was afraid to go out of the house. She is still afraid that he's "going to get me again." She thinks about what Dutiel did to her approximately two to three times per week and, when she goes back to New Lexington, she feels frightened and paranoid. Burton testified that she moved to Columbus after the rape to "start a new life" and is currently working as a home health aide.

{¶9} On cross-examination, Burton stated that, in the Maple Heights home, the bedroom is very close to the front door and she could see the front door of the house from the bedroom because there was no door from the bedroom to the front door. Burton does not know how Dutiel got her phone number. Burton confirmed that neither in the statement she gave police nor in the statement she gave to the nurse at Fairfield Medical Center did she say that she was afraid for her life. When Dutiel took off his

clothes, Burton did not see a gun or a knife.  When asked why she did not just leave, Burton testified that she was scared and in shock.

{¶10}  Burton confirmed that she had bad pains in her left side and ovaries, but did not have this pain when she initially went to Fairfield Medical Center the night of July 8, 2010.  Burton stated that she went to Fairfield Medical Center on August 12, 2010 after a fight with her mom and because someone stole her Celexa medication.  Burton told them at that time she had been raped in July.  Burton returned to Fairfield Medical on August 18, 2010 and indicated to them that day that somebody had raped her in July.  Burton's mother was with her at Fairfield Medical on August 12th and August 18th.  On February 27, 2011, Burton went to the emergency room at Grant Hospital due to pain in her left side and went to the emergency room on April 17, 2011 due to abdominal pain.  When counsel for Dutiel attempted to ask Burton if she was flirting with Dutiel in May of 2010, the trial court excluded the evidence, finding the probative value is outweighed by any prejudice.

{¶11}  On re-direct, Burton testified that she did not suffer any of these medical problems prior to July 8, 2010.  Burton did not run out of the house because she was scared and in shock.  Burton stated that she did not consent to having intercourse with Dutiel on July 8, 2010.  On re-cross-examination, Burton testified that when Dutiel was kissing her in the kitchen, he had her pinned up against the cabinet after grabbing her by the wrist and forced her onto the bed.  However, her arm was not injured.

{¶12}  Sarah Smith ("Smith"), a forensic scientist in the DNA section of the Ohio Bureau of Criminal Investigation ("BCI"), testified about the rape kit analysis performed on samples taken from Burton's body.  Smith stated that when a piece of evidence

comes into the office, it is placed in a secure vault by the evidence receiving staff. Once Smith took control of the case, she went to the vault and scanned the items into her custody to begin her analysis. Semen was identified on vaginal samples and skin swabs from Burton's skin indicated the possible presence of saliva, so they were sent for more sophisticated testing.

{¶13} Smith testified that Exhibit 4 was a document prepared as part of the matters observed by BCI employees under their job duties and prepared and kept in the regular course of BCI's activities. Smith stated that the information contained in Exhibit 4 is part of the ordinary function as a public office and it is generated near in time to when the materials are received. Smith testified that Exhibit 4 is a document prepared in the ordinary course of activities at BCI, prepared as part of matters performed by BCI, prepared and kept in the regular course of BCI's business, and is a list of findings following her analysis of the rape kit.

{¶14} Terri Higgins ("Higgins"), a registered nurse at Fairfield Medical Center, has specialized training for sexual assault cases and examined Burton at the hospital on July 8, 2010. Higgins detailed the sexual assault exam she performed on Burton. Higgins observed reddened and painful tissue in Burton's vaginal area, but does not know what it was from. Higgins testified that Exhibit 15 is the handwritten chart that she did as a record of her exam of Burton and Higgins herself prepared the documents. Further, that the information contained in the exhibit is the type of information important for purposes of medical treatment or diagnosis for sexual assault patients and includes past and present medical history, which is significant. Higgins stated that Burton was alert and oriented and physically in good condition. Higgins testified that Burton's

condition was not unusual for a sexual assault patient because there are a wide range of responses to sexual assault. Higgins stated that once she collected the swabs and samples according to protocol contained on the rape kit, she put them in the kit and then sealed and initialed the kit.

{¶15} Anthony "Dwayne" Winston ("Winston") is an analyst in the genomics department at Laboratory Corporation of America ("LabCorp"). In July of 2010, he was the associate technical director in the forensic identity department, which involves DNA testing. Winston was qualified as an expert without objection. Winston testified that he received the materials he tested from BCI. Winston stated that he is the author of the report introduced as Exhibit 6, which was prepared and kept in the regular course of his work at LabCorp. Comparing the DNA profiles from the neck and nipple swabs with a DNA profile from Dutiel, Winston could not exclude Dutiel as a contributor to the DNA. With regards to the vaginal swab, there was an insufficient amount of male DNA for Winston to develop a profile.

{¶16} Cline testified that he first met Burton when he went to Fairfield Medical to pick up the sealed rape kit. Cline stated that she was very upset and somewhat emotional. The rape kit was sealed when Cline picked it up and he secured it in his personal vehicle until 6:00 a.m. the next morning when he took it to the police department and secured it into the temporary evidence locker. The kit remained secured in the temporary evidence locker until it was removed and transported to BCI for processing.

{¶17} William S. Ervin ("Ervin") works for the New Lexington police and was a detective in 2010. He was not involved in the criminal investigations that Burton made

against Dutiel. Ervin confirmed that Exhibit 11 contains notes he prepared regarding a conversation he had with Dutiel. Ervin testified that Dutiel stopped by a project Ervin was working on and Dutiel told him during the casual conversation that he "may have had sex with that girl." Ervin felt that Dutiel was suggesting the sex was consensual.

{¶18} Dutiel did not testify at trial, but portions of his deposition testimony were read into evidence. Dutiel stated that he called Burton to pick him up that day, but does not know why because his truck was working. He does not remember what he said to Burton when she got to the farm. He could not remember if she said anything that led him to believe that she was interested in having sex with him that day. Dutiel stated that when they went into the house, they were just kissing and he does not know who initiated the kissing, and he would say that he did lock the door to the house. Dutiel touched her breasts while they were in the kitchen and then they went into the bedroom.

{¶19} With regards to what happened in the bedroom, Dutiel invoked his Fifth Amendment privilege against self-incrimination. Dutiel testified that he does not know if Burton indicated why she wanted to have sex with him and he did wonder why an eighteen (18) year old would be interested in having sex with him, but he did not ask her. Dutiel estimates they were in the house for approximately five (5) minutes. Dutiel does not remember telling Ervin that he had sex with Burton.

{¶20} Sari Winerman ("Winerman") is a licensed social worker who works with individuals who have experienced a trauma, including victims of sexual assault. Winerman provided counseling services to Burton and met with her on multiple occasions. Winerman testified that, as a licensed independent professional social worker, she diagnoses psychological conditions that include post traumatic stress

disorder ("PTSD") and depression; further, that the methods she uses to diagnose those conditions are accepted in her field. Winerman stated that, for the purposes of diagnoses and treatment, Burton told her she suffered from a traumatic event, a sexual assault, and told her how it impacted her and her symptoms included flashbacks, nightmares, difficulty sleeping, anxiety, and difficulty concentrating. Winerman diagnosed Burton with PTSD and depression and recommended treatment.

{¶21} On cross-examination, Winerman testified that she is not a psychologist or psychiatrist and that her diagnosis was based upon the self-reporting of Burton. When questioned by the trial court, Winerman testified that she gave Burton a survey to complete and, after she completed an assessment, she looked at the diagnostical statistical manual to see where Burton's responses fit based upon the answers in the survey. To diagnose depression, Winerman assesses a patient as to where they are socially, emotionally, occupationally, and how long the symptoms have lasted. Winerman testified that it is common practice in her field of licensed independent social work to diagnose PTSD and depression and her method of diagnosis is commonly accepted in her field.

{¶22} Syfert testified that Burton is a friend of the family. When she was growing up, she was a "laughy, light" girl. He saw Burton on July 8, 2010 because she wanted to talk to him after the incident. Syfert described Burton as very distraught, broken, and crying on that night. Syfert had to convince her to go to the hospital.

{¶23} Dustin Burton ("Dustin") testified that, prior to July 8, 2010, Burton was happy, outgoing, a "good old country girl" full of joy. He saw Burton at Fairfield Medical on July 8, 2010 and, when he first saw her, she was in shock and looked like a ghost.

Dustin had never seen her look like that before. Burton looked petrified and could not speak. Dustin talked to her and tried to calm her down. Dustin testified that, after the incident, Dutiel was driving his truck around in the neighborhood in front of their house. Dustin stated that Burton's demeanor has changed since the incident. She is a completely different girl, as she is not as open, not outgoing, and does not have the joy in her life that she used to have. While Dustin admitted that Burton is working full-time, he testified that she does not live her life like everyone else and she does not go out with her friends or enjoy life like she used to.

{¶24} Mandy Hiles ("Hiles") testified that her house is around the corner from the Maples Heights home. Hiles saw Burton and Dutiel enter and exit the Maple Heights home because she was having a cookout that day. She saw them pull up in the pickup truck. When they left, Hiles stated that Burton and Dutiel were talking and socializing. Hiles testified that Dutiel's girlfriend offered her lower rent if she filled out an affidavit regarding what she saw that night, but she did not testify to obtain a reduction in rent and she did not actually get a reduction in rent. On cross-examination, Hiles stated that she never called the police to tell them what she saw and she thinks they were in the Maple Heights home for approximately an hour.

{¶25} Dr. David Lowenstein ("Lowenstein") a licensed psychologist, reviewed Burton's medical records. He did not interview or examine Burton in person. He testified that, to diagnose PTSD, a patient must go through a standardized assessment. Lowenstein stated that, in reviewing the medical records, he can see that a lot of people felt Burton had psychological difficulties, but that there is not enough information contained in the records of how those diagnoses were made and there was no actual

psychiatric assessment conducted to properly diagnose her. On cross-examination, Lowenstein testified that because he never met or assessed Burton, he has no opinion as to her psychological or psychiatric difficulties. Lowenstein stated that a licensed social worker cannot do a psychological assessment.

**{¶26}** The jury found Dutiel liable of assault, battery, and intentional infliction of emotional distress, and allowed the following damages in the first phase of the trial: $25,303 for medical expenses; $20,000 for past physical pain; $30,000 for future pain; $50,000 for past emotional pain and suffering; $50,000 for future emotional pain and suffering; $62,348.50 for past mental anguish; $62,348.50 for future mental anguish; and $50,000 for past enjoyment of life. The jury thus allowed a total of $350,000 in compensatory damages. The parties then made arguments regarding punitive damages in the second phase of the trial. The jury awarded Burton $175,000 in punitive damages and found that Burton should recover her attorney fees.

**{¶27}** In a judgment entry on April 18, 2013, the trial court applied Ohio's damages cap statute of R.C. 2315.18(B)(2) to reduce the noneconomic portion of the compensatory damages award to $250,000. Added to the $25,303 in economic damages, the trial court determined a post-cap compensatory damage amount for Burton against Dutiel in the amount of $275,303.

**{¶28}** Dutiel filed a motion for new trial, motion for judgment notwithstanding the verdict, and motion for remittitur, which the trial court denied in a judgment entry on August 26, 2014. On August 26, 2014, the trial court held a hearing on Burton's application for attorneys fees and costs. Burton's total request for fees and costs was $235,343.04, of which $220,168.75 was fees requested. On August 27, 2014, the trial

court issued a judgment entry on attorney fees, determining the reasonable number of hours multiplied by a reasonable hourly rate. The trial court also reviewed the factors contained in *Bittner v. Tri-County Toyota, Inc.*, 58 Ohio St.3d 143, 569 N.E.2d 143 (1990). The trial court granted fees in the amount of $163,206.25 and costs of $15,174.29. The trial court issued a final judgment entry on August 27, 2014 in favor of Burton and against Dutiel in the amount of $628,683.54.

{¶29} Dutiel appeals and assigns the following as error:

{¶30} "I. THE TRIAL COURT ERRED AS A MATTER OF LAW TO THE PREJUDICE OF DEFENDANT AND ALSO ABUSED ITS DISCRETION, BY ENTERING ITS FINAL JUDGMENT IN FAVOR OF PLAINTIFF FOR $628,683.54, AND IN NOT AWARDING A NEW TRIAL OR GRANTING JUDGMENT FOR DEFENDANT NOTWITHSTANDING THE VERDICTS BECAUSE THE JURY VERDICTS AND AWARD OF COMPENSATORY AND PUNITIVE DAMAGES AND ATTORNEY FEES WERE DELIVERED BY A TAINTED JURY IN AN INAPPROPRIATE VENUE. THE JURY WAS BIASED AND INFECTED, AND DEFENDANT'S CALL FOR MISTRIAL SHOULD HAVE BEEN GRANTED.

{¶31} "II. THE TRIAL COURT ERRED AS A MATTER OF LAW TO THE PREJUDICE OF DEFENDANT AND ALSO ABUSED ITS DISCRETION, BY ENTERING ITS FINAL JUDGMENT IN FAVOR OF PLAINTIFF FOR $628,683.54, AND IN NOT AWARDING A NEW TRIAL OR GRANTING JUDGMENT FOR DEFENDANT NOTWITHSTANDING THE VERDICTS, OR REMITTITUR TO A DE MINIMUS AMOUNT. THE JURY VERDICTS AND AWARD OF COMPENSATORY DAMAGES WAS BASED ON PLAINTIFF'S COUNSEL'S IMPROPER AND INFLAMMATORY

STATEMENTS AND IMPROPER ARGUMENT THROUGHOUT THE CASE, IN VIOLATION OF R.C. 2315.18.

{¶32} "III. THE TRIAL COURT ERRED AS A MATTER OF LAW TO THE PREJUDICE OF DEFENDANT AND ALSO ABUSED ITS DISCRETION IN NOT PERMITTING DEFENDANT TO APPEAR, AND IN NOT PERMITTING DEFENDANT TO PRESENT HIS DEFENSE. THIS VIOLATED DEFENDANT'S 5TH AND 14TH AMENDMENT RIGHTS.

{¶33} "IV. THE TRIAL COURT ERRED AS A MATTER OF LAW TO THE PREJUDICE OF DEFENDANT AND ALSO ABUSED ITS DISCRETION, BY ENTERING ITS FINAL JUDGMENT IN FAVOR OF PLAINTIFF FOR $628,683.54, AND IN NOT AWARDING A NEW TRIAL OR GRANTING JUDGMENT FOR DEFENDANT NOTWITHSTANDING THE VERDICTS, OR REMITTITUR BECAUSE THE VERDICTS WERE CONTRARY TO THE EVIDENCE AND CONTRARY TO THE WEIGHT OF THE EVIDENCE. FURTHER, MOST OF THE SO-CALLED MEDICAL AND PSYCHOLOGICAL EVIDENCE SHOULD NOT HAVE COME IN BECAUSE THERE WAS NO FOUNDATION LAID OR IT OTHERWISE VIOLATED THE RULES OF EVIDENCE."

*Judgment Notwithstanding the Verdict, New Trial, and Remittitur*

{¶34} Civil Rule 50(B) governs motions for judgment notwithstanding the verdict. When ruling on a motion for JNOV, a trial court applies the same test as in reviewing a motion for a directed verdict. *Ronske v. Heil Co.*, 5th Dist. Stark No. 2006-CA-00168, 2007-Ohio-5417; *Pariseau v. Wedge Products, Inc.*, 36 Ohio St.3d 124, 522 N.E.2d 511 (1988). In reviewing a motion for JNOV, courts do not consider the weight of the

evidence or the witness credibility; rather, courts consider the much narrower legal question of whether sufficient evidence exists to support the verdict. *Texler v. D.O. Summers Cleaners & Shirt Laundry Co.*, 81 Ohio St.3d 677, 1998-Ohio-602, 693 N.E.2d 271 (1998); *Wagner v. Roche Laboratories*, 77 Ohio St.3d 116, 671 N.E.2d 252 (1996). In other words, if there is evidence to support the nonmoving party's side so that reasonable minds could reach different conclusions, the court may not usurp the jury's function and the motion must be denied. *Osler v. City of Lorain*, 28 Ohio St.3d 345, 504 N.E.2d 19 (1986). Appellate review of a ruling on a motion for JNOV is de novo. *Midwest Energy Consultants, L.L.C. v. Utility Pipeline, Ltd.*, 5th Dist. Stark No. 2006CA00048, 2006-Ohio-6232.

**{¶35}** Civil Rule 59 provides that a, "new trial may be granted to all or any of the parties and on all or part of the issues upon the following grounds" and includes the following: (1) irregularity in the proceedings of the court or jury * * * by which an aggrieved party was prevented from having a fair trial; (2) misconduct of the jury or prevailing party; (4) excessive or inadequate damages, appearing to have been given under the influence of passion or prejudice; (6) the judgment is not sustained by the weight of the evidence * * *; (7) the judgment is contrary to law; and (9) error of law occurring at the trial and brought to the attention of the trial court by the party making the application. Civil Rule 59. In addition to the above grounds, a new trial may also be granted "in the sound discretion of the court for good cause shown." Civil Rule 59.

**{¶36}** In reviewing a trial court's decision regarding a motion for new trial, we use the abuse of discretion standard. *Sharp v. Norfolk & Western Railway Co.*, 72 Ohio St.3d 307, 1995-Ohio-224, 649 N.E.2d 1219. This court may not disturb a trial court's

decision unless we find the decision was unreasonable, unconscionable, or arbitrary. *Id.*, citing *Blakemore v. Blakemore*, 5 Ohio St.3d 217, 450 N.E.2d 1140 (1983). In order to set aside a damage award as against the manifest weight of the evidence, a reviewing court must determine that the verdict is so gross as to shock the sense of justice and fairness and cannot be reconciled with the undisputed evidence in the case. *Shadle v. Morris*, 5th Dist. Stark No. 2012CA00073, 2013-Ohio-906. Thus, in reviewing a motion for a new trial, we do so with deference to the trial court's decision, recognizing that "the trial judge is better situated than a reviewing court to pass on questions of witness credibility and the surrounding circumstances and atmosphere of the trial." *Malone v. Courtyard by Marriott Ltd. P'ship.*, 74 Ohio St.3d 440, 1996-Ohio-311, 659 N.E.2d 1242 (1996).

{¶37} The legal concept of remittitur was developed to provide the trial court with the procedural mechanism by which it could adjust or correct an unjust award. However, prior to doing so, the damages awarded by the jury must be "so manifestly against the weight of the evidence to show a misconception by the jury of its duties." *Howard v. City Loan & Savings*, 2nd Dist. Greene No. 88-CA-39, 1989 WL 33137 (March 27, 1989). "Remittitur is only proper where a court can affirmatively find that the jury's verdict is manifestly excessive." *Uebelacker v. Cincom Systems, Inc.*, 80 Ohio App.3d 97, 608 N.E.2d 858 (1st Dist. Hamilton 1992). Given the deference the trial court is required to give a jury verdict, we must determine whether the trial court abused its discretion in not granting a remittitur. *Van Beusecum v. Cont'l Builders, Inc.*, 5th Dist. Delaware No. 06CAE12-0095, 2008-Ohio-2141.

I.

**{¶38}** Dutiel first argues that the trial court erred in not granting his motion for JNOV and/or motion for new trial because of the biased venue due to pre-trial publicity. Further, that the jury was tainted, biased, and had extraneous knowledge of Dutiel's character.

**{¶39}** The decision whether to change venue is within the trial court's sound discretion and will not be overturned absent an abuse of discretion. *State ex rel. Dunbar v. Ham*, 45 Ohio St.2d 112, 341 N.E.2d 594 (1976). Change of venue in a civil action is governed by Civil Rule 3(C)(4), which states that, "upon motion of any party or upon its own motion the court may transfer any action to an adjoining county within the state when it appears that a fair and impartial trial cannot be had in the county in which the suit is pending." The moving party has the burden of showing that a change of venue is necessary and proper. *Burns v. Prudential Securities, Inc.*, 167 Ohio App.3d 809, 2006-Ohio-3550, 857 N.E.2d 621 (3rd Dist. Marion).

**{¶40}** The Ohio Supreme Court has held that the voir dire process provides the best evaluation as to whether such prejudice exists among community members that precludes the defendant from receiving a fair trial. *Id,* citing *State v. Swiger*, 5 Ohio St.2d 151, 214 N.E.2d 417 (1966). In the interests of judicial economy, convenience, and reduction of public expenses, the trial court must make a good faith effort to seat a jury before granting a change of venue. *State v. Weaver,* 5th Dist. Holmes No. 06CA0001, 2007-Ohio-3357. Further, a party claiming that pretrial publicity denied him a fair trial must show that one or more of the jurors was actually biased. *State v. Treesh*, 90 Ohio St.3d 460, 2001-Ohio-4, 739 N.E.2d 749. Even pervasive adverse

pretrial publicity does not inevitably lead to an unfair trial. *Nebraska Press Assn. v. Stuart*, 427 U.S. 539, 96 S.Ct. 2791, 49 L.Ed.2d 683 (1976). A juror need not be totally ignorant of the facts and issues of the case, but can be exposed to publicity if the juror is able to set aside the pre-trial impressions and render a verdict solely based on the evidence presented at trial. *State v. Weaver,* 5th Dist. Holmes No. 06CA0001, 2007-Ohio-3357.

{¶41} In this case, the trial court deferred ruling on Dutiel's motion for change of venue until after voir dire was conducted. The trial court allowed an extensive voir dire without imposing restrictions or time limits on counsel to question prospective jurors. During voir dire, there was extensive discussion about whether the prospective jurors had knowledge of Dutiel or had seen or read articles about Dutiel in the newspaper. The trial court allowed counsel for Dutiel to individually question, in sequestered voir dire, the prospective jurors who indicated they had been exposed to publicity about Dutiel or had any knowledge of his reputation. Each prospective juror who acknowledged seeing publicity or knowledge of Dutiel was asked in detail about the publicity or their knowledge and what effect, if any, it had on his or her opinion of the case and ability to be impartial. The trial court dismissed for cause the prospective jurors who indicated their knowledge of Dutiel or publicity would cause them to be unfair or impartial.

{¶42} Many of Dutiel's assertions about juror bias are based on statements from jurors who were removed for cause, the majority of which were made outside the presence of the other jurors. The one statement said in open court by a juror who was later removed for cause was that, in reading a newspaper article, he thought the article

portrayed Dutiel as having a "dubious character." However, after this comment, the jurors who were seated indicated they could be fair and impartial.

**{¶43}** Several of the impaneled jurors had no knowledge of Dutiel and never read anything about him in the newspaper. The responses of the impaneled jurors do not indicate any prejudice or predisposition either in favor or against Dutiel. The impaneled jurors that had some knowledge of Dutiel or read an article in the newspaper specifically stated during voir dire that they could be fair and impartial. Thus, Dutiel did not meet his burden to demonstrate that one or more of the jurors were actually biased. From the evidence of record, we do not find that the trial court's action in overruling the motion for change of venue was unreasonable, arbitrary, or capricious, and thus not an abuse of discretion.

**{¶44}** Dutiel also contends it was error for the trial court not to grant his motion for new trial because an alternate juror continued to serve after receiving information from Dutiel's family that she had "lied" about previously being a tenant of Dutiel. The trial court has discretion in determining a juror's ability to be impartial. *State v. Williams*, 6 Ohio St.3d 281, 452 N.E.2d 1323 (1983). "Deference must be paid to the trial judge who sees and hears the juror." *Wainwright v. Witt*, 469 U.S. 412, 105 S.Ct. 844, 83 L.Ed.2d 841 (1985).

**{¶45}** Upon receiving this information, the trial court allowed counsel for both sides to question the alternate juror, N.D., in chambers. N.D. stated that she forgot she had been a tenant of Dutiel's approximately ten (10) years ago when she lived with a boyfriend. N.D. testified that she was never angry with Dutiel and she left because her old boyfriend went to prison. She never had any issues with Dutiel concerning the

house. N.D., an alternate juror who did not deliberate in this case, did not speak with the other jurors about the case and confirmed she could be a fair and impartial juror. Upon further questioning, N.D. again confirmed that neither she nor any of the other jurors had talked about the case. Additionally, the trial court inquired of each juror on the panel whether they had followed her instructions not to discuss the case and form or express an opinion about the case. Each of the jurors was polled by the trial judge and each stated they had followed her instructions not to discuss the case or form or express an opinion about the case. The trial court was satisfied with this and allowed the jurors to continue. From the evidence of record, we do not find that the trial court's decision to deny Dutiel's motion for new trial and/or JNOV based upon the alternate juror was in error.

{¶46} Though Dutiel alleges in his brief that the jury received extraneous information during the trial, he does not identify what this information is. "Misconduct of a jury will not be presumed, but must affirmatively proved." *Lund v. Kline*, 133 Ohio St. 317, 13 N.E.2d 575 (1938). Evidence aliunde is necessary to overcome this presumption. *Id.* In this case, Dutiel has presented no evidence or source of extraneous information considered by the jury. See *Reed v. Evans,* 5th Dist. Guernsey No. CA-715, 1983 WL 7136 (Nov. 16, 1983). The only evidence presented by Dutiel are the statements by the jury panel during voir dire. However, these statements are not relevant to the jury's deliberations and do not indicate that the impaneled jury considered extrinsic evidence. Accordingly, the trial court did not err in denying Dutiel's motion for JNOV and/or new trial because he has not provided evidence that the jury considered extraneous prejudicial information in deliberations.

**{¶47}**  Dutiel's first assignment of error is overruled.

II.

**{¶48}**  It is well settled that counsel is accorded wide latitude in opening statement; however, counsel is not permitted to make statements of law or fact that are obviously erroneous.  *Silver v. Jewish Home of* Cincinnati, 190 Ohio App.3d 549, 2010-Ohio-5314, 943 N.E.2d 577 (12th Dist. Warren).  This same standard is applied to closing argument.  *Pang v. Minch*, 53 Ohio St.3d 186, 559 N.E.2d 1313 (1990).  Remarks that are not supported or warranted by the evidence and that are calculated to arouse passion or prejudice may constitute prejudicial error.  *Id.* A trial court's ruling with respect to opening and closing statements will not be reversed on appeal absent an abuse of discretion.  *Id.*

**{¶49}**  Dutiel first argues that the trial court erred in not granting a new trial or JNOV based upon Burton's counsel's comments in opening and/or closing statement appealing to the jury to "send a message."  Dutiel argues these statements regarding "sending a message" are improper, inflammatory, and inappropriately allowed counsel for Burton to include punishment in the compensatory damage phase of the bifurcated trial.

**{¶50}**  We first note that Dutiel failed to object to these "send a message" statements during opening or closing argument.  Further, the trial court clearly instructed the jury that opening and closing arguments are not evidence and should not be treated as such.  The trial court also instructed the jury that in the compensatory phase, the jury shall not consider any evidence offered for the purpose of punishing the defendant rather than offered for a compensatory purpose.  A jury is presumed to have

properly followed instructions given by a trial court.  *Id.*  Burton's counsel specifically asked the jury to "place a monetary value" on Burton's damages and discussed the types of noneconomic compensatory damages that could be awarded such as physical injury, mental pain, and loss of enjoyment of life.  Additionally, the jury's award in the compensatory phase of less than half of what counsel for Burton requested in closing argument demonstrates that the jury was not led astray by the argument.  *Borucki v. Skiffey*, 11th Dist. Trumbull Nos. 2000-T-0029, 2000-T-0057, 2001-Ohio-4340.  Based upon the lack of objection to the statements and the evidence adduced at trial, the jury's verdict does not appear to have been rendered to punish appellant or to send a message to the community.

**{¶51}** Dutiel also contends the trial court erred in not granting a new trial or JNOV due to Burton's counsel's comments during closing argument.  Dutiel argues that, in closing argument, when Burton's counsel stated that Burton was "innocent," "young and meek," that Burton was "telling the truth," and Dutiel "savagely attacked her," the jurors were improperly inflamed and the compensatory damages award was due to passion and prejudice.

**{¶52}** Dutiel failed to object to a majority of these statements.  Dutiel did object to the use of the word "innocent."  The trial court conducted a sidebar, at which the trial judge instructed counsel to refrain from using that word again.  Additionally, the trial court clearly instructed the jury that opening and closing arguments are not evidence and a jury is presumed to have properly followed instructions given by a trial court.  *Pang v. Minch*, 53 Ohio St.3d 186, 559 N.E.2d 1313 (1990).  Even if the "innocent" statement was inappropriate, this comment is not so egregious in light of the remaining

evidence adduced as to warrant reversal for a new trial or a JNOV. *Dillon v. Bundy*, 72 Ohio App.3d 767, 596 N.E.2d 500 (10th Dist. Franklin 1991). Having read the entirety of Burton's opening and closing argument, the record is devoid of instances of conduct so highly improper or inflammatory as to amount to clear evidence that the verdict was the product of the jury's passion or prejudice. See *Jemson v. Falls Village Retirement Comm., Ltd.*, 9th Dist. Summit No. 20845, 2002-Ohio-4155.

**{¶53}** Dutiel next argues Burton's counsel's opening and closing statements improperly included "comments attacking the opposing party, counsel, or the opponent's theory of the case." Specifically, Dutiel points to Burton's counsel's statement in closing argument that, "according to the defense, [Burton] consented to sex with Dutiel because she did not have actual knowledge that he had a gun or a knife and, therefore, was required to physically attack Dutiel to the point that she broke her arm." Counsel may make remarks regarding opposing parties, opposing counsel, and their arguments so long as these remarks are supported or warranted by the evidence and not calculated to arouse passion and prejudice. *Dillon v. Bundy*, 72 Ohio App.3d 767, 596 N.E.2d 500 (10th Dist. Franklin 1991). However, counsel is under a duty to refrain from unwarranted attacks upon opposing counsel. *Jones v. Macedonia-Northfield Banking Co.*, 132 Ohio St. 341, 7 N.E.2d 544 (1937).

**{¶54}** In this case, Dutiel failed to object to this statement during closing argument. Further, during the trial, Dutiel's counsel focused on whether Burton knew or did not know that Dutiel had a gun or a knife and whether, if Dutiel had yanked her arm, it would have broken. In light of the evidence adduced at trial, Burton's counsel's comments were within the scope of commentary upon the evidence before the jury.

**{¶55}** Dutiel finally contends that Burton's counsel's closing argument was improper and inflammatory by asserting his "personal knowledge" that Dutiel or his girlfriend had bribed a witness. In closing argument, Burton's counsel stated that, "for some strange reason, defense counsel thought it necessary to inform you that Mr. Dutiel's mistress offered bribes to anyone who was at that house." The trial court sustained Dutiel's objection to the statement. The trial court instructed the jury that closing arguments are not evidence and, further, that any statements to which a court sustained an objection are not evidence and must be treated as though you never heard them. As noted above, a jury is presumed to have properly followed instructions given by the trial court. Further, during Dutiel's case, Hiles testified that though she did not accept the reduction, Dutiel's girlfriend offered her a reduction in rent if she would fill out an affidavit.

**{¶56}** In sum, the record does not contain instances of conduct so highly improper or inflammatory in Burton's opening or closing statements as to exceed the bounds of propriety or to amount to clear evidence that the verdict was the product of passion or prejudice. The statements are not so egregious in light of the remaining evidence adduced as so to warrant reversal for a new trial or JNOV.

**{¶57}** Dutiel also filed an alternative motion for remittitur, arguing that the damages award to Burton was excessive and not based upon the facts and asks this Court, if a new trial is not ordered, to reduce the award by ordering a remittitur. As discussed above, there is nothing in the record to suggest that the verdict was influenced by passion or prejudice, nor is there any indication that this award was

unsupported by the evidence. The trial court did not abuse its discretion in denying Dutiel's motion for remittitur with regards to opening and closing arguments.

**{¶58}** Dutiel's second assignment of error is overruled.

III.

**{¶59}** Dutiel argues that the trial court erred in not permitting him to appear and defend his case. Further, that since he was not allowed to appear, his conviction and no contest plea were "constructively used" to prejudice his position in the civil case.

**{¶60}** "An individual does not have an absolute right to be present in a civil case to which he is a party." *Wagner v. A.C. Strip*, 5th Dist. Licking No. 11-CA-82, 2012-Ohio-4954. More specifically, prisoners have no constitutional right to be personally present at any state of the judicial proceedings. *Id.*; *Mancino v. City of Lakewood*, 36 Ohio App.3d 219, 523 N.E.2d 332 (8th Dist. 1987). The decision of whether or not to permit an incarcerated individual to attend a civil proceeding is a matter within the discretion of the trial court. *Id.* An abuse of discretion is "more than an error of law or judgment; it implies that the court's attitude is unreasonable, arbitrary, or unconscionable." *Blakemore v. Blakemore*, 5 Ohio St.3d 217 450 N.E.2d 1140 (1983). Whether an inmate should be brought to court to personally argue his case in a civil matter depends upon the particular and unique facts and circumstances of each case. *Id*; *Mills v. Mills*, 10th Dist. Franklin No. 10AP-495, 2011-Ohio-2848.

**{¶61}** In this case, Dutiel had counsel, gave a deposition prior to his motion to convey, and had the opportunity to record video trial testimony, although he chose not to. The matter could be resolved without Dutiel's presence at trial and the trial court's decision to proceed without his presence was not an abuse of discretion.

**{¶62}** Dutiel specifically argues that he should have been allowed to attend the trial due to Evidence Rule 410 and Criminal Rule 11(B)(2), which provide that evidence of a no-contest plea is not admissible in any civil or criminal proceeding against the defendant who made the plea.

**{¶63}** We first note that neither Evidence Rule 410 nor Criminal Rule 11(B)(2) are triggered by Dutiel's motion to convey as the motion to convey is unrelated to Dutiel's no-contest plea or the negotiations surrounding it. Further, although Rule 410 and Criminal Rule 11(B)(2) may prevent the use of the no-contest pleas and convictions, it does not "prevent the use of the facts" surrounding the conviction and no contest plea. *Elevators Mutual Ins. Co. v. J. Patrick O'Flaherty's Inc.*, 125 Ohio St.3d 362, 2010-Ohio-1043, 928 N.E.2d 685. Finally, the trial court went to great lengths to ensure that Burton's counsel, witnesses, and other evidence did not include information regarding Dutiel's plea. During voir dire, the venire was thoroughly questioned regarding any potential bias or feelings concerning the lack of Dutiel's appearance at trial. The trial court extensively reviewed the evidentiary documents submitted by Burton, the witnesses presented by Burton, and the deposition of Dutiel to strike, redact, and delete any reference to Dutiel's plea. Accordingly, we find that Dutiel's no contest plea was not "constructively" used to prejudice him. The trial court did not abuse its discretion denying Dutiel's motion to convey.

**{¶64}** Dutiel also argues in this section of his brief that the trial court's refusal to allow Dutiel to put on evidence of Burton's sexual history and flirtatious nature denied him a fair trial. Dutiel sought to read evidence contained in his deposition that Burton previously flirted with him, let her fondle him in front of her mother, and that Burton and

her mother invited him on a "sex vacation" a month prior to July 8, 2010.  Dutiel contends this evidence would have shown that he believed the sex was consensual.

**{¶65}** A trial court enjoys broad discretion regarding the admissibility of evidence.  Thus, an appellate court should not disturb the trial court's decision absent an abuse of discretion.  *State v. Diar*, 120 Ohio St.3d 460, 2008-Ohio-6266, 900 N.E.2d 565.

**{¶66}**  Dutiel did not give any testimony about what happened in the bedroom on the night of July 8, 2010.  Thus, if Dutiel were allowed to present evidence as to prior contact with Burton or her mother, there would have been no evidence to connect it to his mental state on July 8, 2010 since he did not provide any testimony as to what happened in the bedroom that night.  Accordingly, the evidence in question would be used merely to impeach the credibility of Burton and is not determinative of the issue as to whether Dutiel assaulted Burton on July 8, 2010.  See *State v. Kaufman*, 187 Ohio App.3d 50, 2010-Ohio-1536, 931 N.E.2d 143 (7th Dist. Mahoning).  Additionally, we find the trial court did not abuse its discretion in ruling that any probative value of Burton's and her mother's supposed sexual history is outweighed by the danger of unfair prejudice.  See Evid.R. 403; *State v. Kaufman*, 187 Ohio App.3d 50, 2010-Ohio-1536, 931 N.E.2d 143 (7th Dist. Mahoning); *State v. Hart*, 112 Ohio App.3d 327, 678 N.E.2d 952 (12th Dist. Butler 1996).

**{¶67}**  Dutiel's third assignment of error is overruled.

IV.

*Proving Emotional Distress*

**{¶68}** Dutiel argues the trial court erred in denying his motion for new trial and/or JNOV because the damage award for past and future mental anguish and for past pain and suffering was the result of passion and/or prejudice.

**{¶69}** Dutiel first contends there is no "before" and "after" evidence to substantiate claims for significant emotional distress and/or present or future mental anguish. Dutiel points out that Burton testified that she is working full time and her income has increased since July 8, 2010.

**{¶70}** The assessment of damages is a matter within the province of the jury. *Wilburn v. Cleveland Elec. Illum. Co.*, 74 Ohio App.3d 401, 599 N.E.2d 301 (8th Dist. Cuyahoga 1991). The jury's determination should not be set aside unless the damages awarded were so excessive as to appear to have been awarded as a result of passion and prejudice, or unless the amount is so manifestly against the weight of the evidence as to show a misconception by the jury of its duties. *Toledo, C & O R.R. Co. v.* Miller, 108 Ohio St. 388, 140 N.E.2d 617 (1923). Serious emotional distress may be found where a reasonable person, normally constituted, would be unable to cope adequately with the mental distress engendered by the circumstances of the case. *Paugh v. Hanks*, 6 Ohio St.3d 72, 451 N.E.2d 72 (1983). Expert testimony is not "indispensible" to a claim of serious emotional distress and, in lieu of expert testimony, a plaintiff may "submit the testimony of lay witnesses who are acquainted with the plaintiff as to any marked changes in the emotional or habitual makeup of the plaintiff following a

defendant's allegedly culpable conduct." *Powell v. Grant Medical Center*, 148 Ohio App.3d 1, 2002-Ohio-443, 771 N.E.2d 874 (10th Dist. Franklin).

**{¶71}** Burton stated that she was in shock and afraid for her life during and immediately after the rape and that the exam at the hospital was embarrassing and painful. Further, that she was scared and sought counseling. Burton testified that when the incident happened, she was afraid to leave the house and she is "still afraid" that Dutiel is going to get her. She stated that she thinks about what Dutiel did to her approximately 2-3 times per week and had to move to start a new life. Further, that when she returns to her hometown, she is scared and paranoid. Higgins testified that the sexual assault exam was uncomfortable and she noted reddened, painful tissue in Burton's vaginal area.

**{¶72}** Cline testified that on the night of July 8, 2010 when he saw Burton, she was upset and emotional. Syfert testified that Burton used to be a "laughy" and "light" girl, but when he saw her on July 8, 2010, she was "distraught" and "broken." Dustin stated that when he saw Burton on July 8, 2010, she was in shock, looked like a ghost, was petrified, and could not speak. Dustin testified that, prior to July 8, 2010, Burton was happy, outgoing, full of joy; now, her demeanor has changed and she is a completely different girl who is not open, not outgoing, and there is no joy in her life like there used to be. Dustin further stated that while Burton is working full-time, she does not live her life like everyone else, does not go out with friends like she used to, and does not enjoy her life like she used to.

**{¶73}** In addition, Winerman diagnosed Burton with PTSD and depression, stating that Burton reported having nightmares, flashbacks, difficulty sleeping, anxiety,

and difficulty concentrating. Though Dutiel argues that Winerman's diagnosis was not valid because it was based upon what Burton told her, Winerman testified that, as a licensed independent professional social worker, she diagnoses psychological conditions that include post traumatic stress disorder ("PTSD") and depression. Further, that the methods she uses to diagnose those conditions are accepted in her field. Dutiel's counsel extensively questioned Winerman on her diagnosis on cross-examination and Dutiel's expert testified that, based upon the medical records presented, he could not make a diagnosis of depression or PTSD. With regards to this conflicting testimony, the trier of fact is in the best position to view the witnesses and their demeanor in making a determination of the credibility of the testimony. *DeMoss v. Smailes,* 5th Dist. Coshocton No. 2009CA00015, 2010-Ohio-1910. The trier of fact is free to believe all, part, or none of a witness' testimony. *Id.*

**{¶74}** Merely because Burton is working full time and her income has increased since July 8, 2010 does not necessarily mean that she has not suffered any past pain and suffering or past and/or future mental anguish. We find the trial court did not err in denying Dutiel's motion for JNOV and/or new trial as to past pain and suffering and mental anguish damages based upon emotional distress because the damages awarded were not so excessive as to appear to have been awarded as a result of passion or prejudice and not manifestly against the weight of the evidence.

**{¶75}** Dutiel also argues that the medical records were admitted to improperly bolster the damage award for past pain and suffering and mental anguish. Dutiel contends the statements are not medically relevant, no foundation was laid for them, and specifically cites as error the trial court's admission of a record by Dr. Rangwani

with regards to his diagnosis of "adjustment disorder." The admission or exclusion of evidence is within the sound discretion of the trial court. *State v. Diar*, 120 Ohio St.3d 460, 2008-Ohio-6266, 900 N.E.2d 565.

{¶76} While Dutiel objected at trial to the admission of Exhibit 17, his objections to Exhibit 17 in his motion in limine and at trial were with regards to references in the documents to "sexual assault" or "rape," and also concerning references in the documents to the criminal conviction, including the plea agreement and the fact that Dutiel is in prison. The trial court and the parties reviewed the documents in Exhibit 17 and, pursuant to these discussions, various contested portions of the records were redacted or stricken. When Burton requested the redacted portion of Exhibit 17 be admitted, Dutiel's counsel objected because the records were not taken for purposes of treatment, but were taken for "purposes of evidence." Many of the specific objections contained in Dutiel's brief were not objected to at trial or contained in the motion in limine.

{¶77} Burton testified that Exhibit 17 contains copies of her medical records since July 8, 2010 and that the statements she made in the records were made for the purposes of diagnosis and treatment. Further, that she did not suffer any of these medical problems prior to July 8, 2010. Dutiel did not object to this testimony or submit any evidence to rebut Burton's testimony that the records were made for the purposes of diagnosis or treatment. As a general rule, authenticated hospital records are admissible at trial. *Hunt v. Mayfield,* 65 Ohio App.3d 349, 583 N.E.2d 1349 (2nd Dist. Montgomery 1989). Pursuant to R.C. 2317.422, hospital records may be authenticated via certification of the custodian of records rather than by live testimony at trial as to

their preparation. An examination of each set of medical records in Exhibit 17 shows that each was accompanied by a proper certification in compliance with R.C. 2317.422 (A), which states that, "* * * the records, or copies or photographs of the records, of a hospital * * * in lieu of testimony in open court of their custodian * * * may be qualified as authentic evidence if any such person endorses thereon his valid certification identifying such records, giving the mode and time of their preparation, and stating that they were prepared in the usual course of business of the institution * * *." Based upon Burton's testimony and these certifications, there was a proper foundation laid for the admission of the medical records and authentication was accomplished in accordance with R.C. 2317.422(A).

{¶78} In addition, Dutiel's own expert utilized the disputed records and relied on them to formulate his expert opinion that a psychological diagnosis could not be made. See *Reneau v. Con-Way Transp. Serv.*, *Inc.*, 6th Dist. Wood No. WD-07-0003, 2007-Ohio-6368. Based upon the foregoing, we cannot say that the trial court's admission of Exhibit 17 was so unreasonable, arbitrary, or unconscionable that it amounts to an abuse of discretion.

{¶79} Further, even assuming, arguendo, that the trial court erred in admitting the records of Dr. Rangwani, we find any error harmless as the testimony as detailed above regarding past pain and suffering and mental anguish was sufficient competent and credible evidence of serious emotional distress. See *O'Brien v. Angley*, 63 Ohio St.2d 159, 407 N.E.2d 490 (1980).

*Physical Pain & Medical Expenses*

**{¶80}** Dutiel contends the trial court erred in not granting his motion for JNOV and/or motion for new trial with regards to the damages awarded for medical expenses and past physical pain.  Dutiel argues that there is no proof of physical injury; that the medical records should not have been admitted because no foundation was laid for their admission; and that the unauthenticated medical bills should not have been admitted into evidence as they had no relation to the July 2010 event.

**{¶81}** Compensatory damages include economic damages.  *Whitaker v. M.T. Automotive, Inc.*, 111 Ohio St.3d 177, 2006-Ohio-5481, 855 N.E.2d 825.  The economic losses that an injured person may recover in a tort action include expenditures for medical care and treatment, rehabilitation services, and other care, treatment, and services incurred as a result of the injury.  R.C. 2315.18(A)(2)(b).  As to past medical expenses, a plaintiff is qualified to testify as to injuries and medical treatment.  *Turner v. Progressive Ins. Co.*, 5th Dist. Holmes No. 2007CA015, 2008-Ohio-4988.  It is unnecessary to have an expert testify as to the necessity of the medical expense.  *Id.*

**{¶82}** Dutiel contends there is no proof of physical injury in this case.  We disagree.  Burton testified that, after the night of July 8, 2010, she has a sharp pain in her left side and ovary problems.  She stated that she did not suffer any of these medical problems prior to July 8, 2010.  Higgins testified that she observed reddened and painful tissue in Burton's vaginal area on July 8, 2010.  Winerman diagnosed Burton with depression and PTSD, and further stated that Burton reported having flashbacks, nightmares, difficulty sleeping, anxiety, and difficulty concentrating.  As discussed above, we find the trial court did not err in admitting the medical records that

it did.  Further, even if the trial court did err in admitting the record from Dr. Rangwani, it did not prejudice Dutiel with regards to the damages for past physical injury as, even without Dr. Rangwani's records, there is evidence to support the damage award for past physical injury.

{¶83}  Dutiel argues the trial court erred in admitting the medical bills (Exhibit 18) into evidence because they were unauthenticated and not related to the July 8, 2010 incident.   A trial court is vested with broad discretion in determining the admissibility of evidence in any particular case, so long as such discretion is exercised in line with the rules of procedure and evidence and the admission of relevant evidence rests with the sound discretion of the trial court.  *State v. Sage*, 31 Ohio St.3d 173, 510 N.E.2d 343 (1987).   The Ohio Supreme Court has held that, "proof of the amount paid or the amount of the bill rendered and of the nature of the services performed constitutes prima facie evidence of the necessity and reasonableness of the charges for medical and hospital services."   *Wagner v. McDaniels*, 9 Ohio St.3d 184, 459 N.E.2d 561 (1984).

{¶84}  We conclude that the trial court did not err in submitting the medical bills to the jury.  Burton authenticated the medical bills, testifying that Exhibit 18 is a fair and accurate copy of her medical bills since the incident on July 8, 2010 and it contains the bills associated with the instant case.  These bills were prima facie evidence of the reasonableness of the charges.  Dutiel's argument that the bills had no relation to the July 2010 incident was raised in Dutiel's cross-examination of Burton.  Dutiel presented no other evidence to question the reasonableness or necessity of the medical expenses.   The question of the weight and sufficiency of such evidence was

appropriately left to the jury.  *Ronk v. Hall,* 5th Dist. Delaware No. 87-CA-9, 1987 WL 33003 (Dec. 31, 1987).

*Burton's Testimony*

**{¶85}**  Dutiel contends the trial court erred in not granting his motion for new trial and/or JNOV because there was no competent or sufficient proof of Dutiel's wrongdoing due to Burton's incoherent testimony.

**{¶86}**  "The trial judge is better situated than a reviewing court to pass on questions of witness credibility and the surrounding circumstances and atmosphere of the trial."  *Malone v. Courtyard by Marriott Ltd. P'ship*,  74 Ohio St.3d 440, 1996-Ohio-311, 659 N.E.2d 1242.   Further, the trier of fact is in the best position to view the witnesses and their demeanor in making a determination of the credibility of the testimony.  *DeMoss v. Smailes,* 5th Dist. Coshocton No. 2009CA00015, 2010-Ohio-1910.   The trier of fact is free to believe all, part, or none of a witness' testimony.  *Id.* We have reviewed the record in this matter and find any discrepancies in Burton's testimony go to the credibility of the witness, which the trier of fact was in the best position to assess, and does not necessarily result in the trier of fact discrediting any, let alone all, of Burton's testimony.  The jury had competent and credible evidence upon which it could conclude Dutiel was liable.  The trial court did not err in denying a new trial and/or JNOV based on Burton's testimony.

*Loss of Enjoyment of Life*

**{¶87}**  Dutiel argues the trial court erred in not granting a new trial and/or JNOV as to the jury award of $50,000 for loss of enjoyment of life since this award was the

result of passion, prejudice, and mistake. Dutiel contends there was no evidence presented as to loss of enjoyment of life.

**{¶88}** Compensatory damages include compensation for the loss of enjoyment of life. *Fantozzi v. Sandusky Cement Prod. Co.*, 64 Ohio St.3d 601, 1992-Ohio-138, 597 N.E.2d 474. Thus, recovery is permitted for the loss of ability to perform the plaintiff's "usual functions," and are designed to compensate the plaintiff for the "deprivation of one's ability to engage in those activities, and perform those functions, which were part of, and provided pleasure to, one's life prior to the injury." *Id.*

**{¶89}** In this case, Burton testified that she thinks about what Dutiel did numerous times per week, she is still afraid he is going to get her, she does not like to visit her hometown and, when she does, she is scared and paranoid. Winerman stated that Burton reported to her having nightmares, flashbacks, and difficulty sleeping on a daily basis. Dustin testified that Burton does not live her life like everyone else and does not go out with friends like she used to. Based upon the evidence presented, we find the jury's award for loss of enjoyment of life was not the result of passion, prejudice, or a mistake and the trial court did not err in granting the motion for new trial and/or JNOV as to the loss of enjoyment of life.

*Past Emotional Pain and Suffering*

**{¶90}** Dutiel contends the trial court erred in not granting his motion for new trial and/or JNOV because there was no evidence as to past pain and suffering and no expert testimony was offered as to her pain and suffering.

**{¶91}** An award for non-economic loss caused by an injury may include amounts for pain and suffering and any other intangible loss. R.C. 2315.18(A)(4). "Damages for

pain and suffering should be awarded if the evidence demonstrates that pain and suffering occurred." *Crosby v. Lenart*, 9th Dist. Wayne No. 2896, 1995 WL 230895 (April 19, 1995). "Pain and suffering are subjective feelings, [and] the injured person's testimony is the only direct proof of such damages * * * Therefore, lay testimony is sufficient by itself to prove past pain and suffering damages." *Youssef v. Jones*, 77 Ohio App.3d 500, 602 N.E.2d 1176 (6th Dist. Lucas 1991).

{¶92} In this case, several witnesses testified about Burton's pain and suffering. Burton testified she has a sharp pain in her left side, ovary problems, and needed to obtain counseling after the incident. Further, that she was afraid to leave the house after the incident and the incident made her feel like a "low life." Cline testified that, on the night of the incident, Burton was very upset. Winerman stated that Burton reported anxiety after the incident. Syfert testified that, when he saw Burton, she was distraught, crying, and "broken." Dustin stated that Burton was in shock, petrified, and could not speak on the night of the incident. Based upon this testimony, we find the trial court did not err in denying Dutiel's motion for new trial and/or JNOV with regards to past pain and suffering.

*Future Pain and Suffering and Future Physical Pain*

{¶93} Dutiel argues the trial court erred in failing to grant his motion for new trial, JNOV, and/or remittitur with regards to future pain and suffering and future physical pain damage awards.

{¶94} An award of future damages is limited to damages reasonably certain to occur from the injuries. *H.J. v. Baddley*, 5th Dist. Stark No. 2008CA171, 2009-Ohio-4318. "A plaintiff's claim for future medical expenses or future physical pain must be

supported by evidence that reasonably establishes the amount likely to be incurred for the future medical treatment." *Bowers v. Next Generation Films, Inc.*, 5th Dist. Richland No. 08 CA 43, 2009-Ohio-1153. Further, in the case of an objective injury, such as the loss of a body member, the jury may draw their conclusions as to future pain and suffering from the fact of the injury alone. *Jordan v. Elex, Inc.*, 82 Ohio App.3d 222, 611 N.E.2d 852 (1st Dist. Hamilton 1992). However, if an alleged injury is subjective in character, the claimant must present expert evidence as to future pain and suffering. *Bowers v. Next Generation Films, Inc.*, 5th Dist. Richland No. 08 CA 43, 2009-Ohio-1153.

**{¶95}** In this case, Burton did not offer any evidence to establish the amount of future medical expenses or physical pain "likely to be incurred for the future medical treatment." The remaining injuries claimed by Burton are subjective in nature and expert evidence was required to establish the injuries and probability of future pain and suffering. In reviewing the record, there is no expert testimony regarding the pain and suffering Burton will endure in the future. Accordingly, we find the trial court erred in not granting Dutiel's motion for JNOV and/or motion for remittitur as to damages for future physical pain ($30,000) and future pain and suffering ($50,000).

*Punitive Damages*

**{¶96}** Dutiel argues the trial court erred in not granting his motion for JNOV and/or new trial on the issue of punitive damages because, due to Burton's counsel's statements in opening and closing arguments, the jury had already been instructed by Burton's counsel to enhance the compensatory damage award. Based upon our

analysis in Assignment of Error III, we find the trial court did not err in denying Dutiel's motion for new trial and/or JNOV on punitive damages.

*Lab Tests*

**{¶97}** Dutiel argues the trial court erred in not granting his motion for new trial because the DNA test results from the rape kit were inadmissible due to chain of custody issues.

**{¶98}** A trial court is vested with broad discretion in determining the admissibility of evidence in any particular case, so long as such discretion is exercised in line with the rules of procedure and evidence and the admission of relevant evidence rests with the sound discretion of the trial court. *State v. Sage*, 31 Ohio St.3d 173, 510 N.E.2d 343 (1987). The issue of whether there exists a break in the chain of custody is a determination left up to the trier of fact. *State v. Justice*, 5th Dist. Fairfield No. 10 CA 41, 2011-Ohio-4004. Even if the chain of custody is broken, the fact alone will not render the evidence inadmissible. *Id.* The state "is not required to prove a perfect, unbroken chain of custody * * * a break in the chain of custody, if any, goes to the weight or credibility of the evidence, and not its admissibility." *State v. Wilson*, 5th Dist. Stark No. 2013 CA 00078, 2014-Ohio-461.

**{¶99}** Burton presented the testimony of Cline, Smith, and Winston regarding the chain of custody of the rape kit and DNA test results. Cline testified he took the sealed rape kit from the hospital, to the evidence locker, where it remained until it was transported to BCI. Winston stated that he received the materials from BCI, including DNA from Dutiel and swabs from Burton. Smith testified regarding the rape kit and DNA analysis and stated that when the evidence comes in to BCI, it is placed in a secure

vault until it is scanned out to individual employees. Based upon this testimony, we find there is no indication the jury lost its way in determining the credibility and weight of the DNA evidence and its chain of custody. The trial court did not err in denying Dutiel's motion for new trial and/or JNOV on this basis.

*Attorney Fees*

{¶100} Dutiel argues the trial court erred in not granting his motion for new trial and/or JNOV with regards to attorney fees. Dutiel contends the lodestar method does not apply in this case because Burton and her attorneys had a contingency fee agreement.

{¶101} An award of attorney fees is within the sound discretion of the trial court. *Rand v. Rand*, 18 Ohio St.3d 356, 481 N.E.2d 609 (1985). While the fact that Burton and her attorneys had a contingency fee agreement is *one* factor a trial court considers when awarding attorney fees, it is not the only factor a trial court must consider. The trial court must determine the number of hours expended multiplied by a reasonable hourly rate. *Bittner v. Tri-County Toyota*, 58 Ohio St.3d 143, 569 N.E.2d 464 (1991). Once this "lodestar figure" is calculated, the trial court can modify the calculation by applying the factors listed in Rule 1.5 of the Ohio Rules of Professional Conduct, including: time and labor involved in maintaining the litigation; the novelty and difficulty of the questions involved; the professional skill required to perform the necessary legal services; the attorney's ability to accept other cases; the fee customarily charged; the amount involved and results obtained; any necessary time limitations; the nature and length of the attorney/client relationship; the experience, reputation, and ability of the

attorney; and whether the fee is fixed or contingent. *Canton v. Irwin*, 5th Dist. Stark No. 2011CA0029, 2012-Ohio-344.

{¶102} In this case, the trial court specifically cited the *Bittner* case, determined the reasonable hourly rate for each attorney and paralegal involved, and determined the number of hours expended. The trial court went through the factors listed in Rule 1.5 of the Ohio Rules of Professional Conduct, finding: the case involved a significant amount of time; was difficult because it involved various legal issues; there were a multitude of pleadings and issues which required a high level of professional skill; Burton prevailed; the expert testified as to counsel's good reputation and experience; and the fee was contingent. While Burton's counsel requested $220,168.75 in fees, the trial court found, based upon the lodestar method and factors in Rule 1.5, that the appropriate award for Burton's attorney fees is $163,206.25. Upon review of the record, we find the trial court did not abuse its discretion in awarding $163,206.25 in attorney fees to Burton.

*Remittitur*

{¶103} Dutiel filed an alternative motion for remittitur, arguing that the damages award to Burton were excessive and not based upon the facts and asks this Court, if a new trial is not ordered, to reduce the award by ordering a remittitur. As discussed above, other than the award for future physical pain and future pain and suffering, there is nothing in the record to suggest that the verdict was influenced by passion or prejudice, nor is there any indication that the balance of the award was unsupported by the evidence.

{¶104} Dutiel's fourth assignment of error is sustained with regards to the $30,000 for future physical pain and $50,000 for future physical pain and suffering. The

remainder of the arguments contained in Dutiel's fourth assignment of error are overruled.

{¶105} Based upon the foregoing, Dutiel's first, second, and third assignments of error are overruled.   Dutiel's fourth assignment of error is overruled in part and sustained in part.   The judgment entry of the Perry County Court of Common Pleas is affirmed in part and reversed in part and we remand the matter to the trial court for further proceedings in accordance with the law and this opinion.


By Gwin, P.J.,

Wise, J., and

Baldwin, J., concur